UNITED STATES of America,
Plaintiff,

v.

State of WASHINGTON, Defendant.

Case No. 9213.

United States District Court,
W.D. Washington,
at Seattle.

COMPILATION OF MAJOR
POST–TRIAL SUBSTANTIVE ORDERS
(January 1, 1991 through December 31,
1993)

See appellate decisions, 96 F.3d 334, 157
F.3d 630.

## TABLE OF CONTENTS

ORDER PAGE

Report and Recommendation on Halibut Allocation (3/22/91) 1176
Report and Recommendation (10/3/91) 1181

Proposed Findings of Fact and Conclusions of Law (10/3/91) 1182

Order re Report and Recommendation Filed on October 3, 1991 (5/18/92) 1202

Order Denying Motion for Summary Judgment on the Issue of Moderate Living and
Denying Application for Protective Order (4/6/93) 1203

Order Dismissing Without Prejudice Phase II and Certain Subproceedings in Phase
I (6/23/93) 1205

Order re: Chehalis Indian Reservation Boundaries (7/2/93) Order Modifying
Paragraph 25 of Permanent Injunction (8/24/93) 1206

Order Granting Plaintiff Tribes' Summary Judgment Motion That Shellfish Are Fish
(9/2/93) 1216

Order on Five Motions Relating to Treaty Halibut Fishing (12/29/93) 1219

COMPILATION OF MAJOR POST-
TRIAL SUBSTANTIVE ORDERS
(Through December 31, 1993)

Sub–Proceeding # 91–1

REPORT AND RECOMMENDATION
ON HALIBUT ALLOCATION

(Mar. 22, 1991)

JOHN E. WEINBERG, United States Magistrate Judge.

### INTRODUCTION

Twelve tribes are authorized to fish for halibut by regulations of the International Pacific Halibut Commission (IPHC). That agency has also set a commercial harvest limit of 102,500 lb. of halibut for 1991 for all twelve of the tribes, but has not pre-scribed any allocation of that amount among the specific tribes.

Four of those tribes move for a prelimi-nary injunction, which would set a ceiling of 70,100 lb. on the 1991 commercial har-vest of halibut by the Makah Tribe. This would leave 32,400 lb. for the "moving tribes" and the other seven tribes. The four moving tribes are the Jamestown Klallam, Lower Elwha, Port Gamble, and Skokomish.

Pending resolution of the motion for a preliminary injunction, the court has closed treaty fishing for halibut. At the time of the closure, the 1991 halibut catches by the respective tribes were:

| | Weight | Percentage |
|----------------|-------------|------------|
| Makah | 56,241 lb. | 72.6% |
| Quileute | 19,652 | 25.4 |
| Lower Elwha | 1,253 | 1.6 |
| Lummi | 280 | 0.4 |
| Jamestown Kl. | 12 | 0.0 |
| 7 other tribes | 0 | 0.0 |
| TOTAL CATCH | 77,438 lb. | 100.0 |

Halibut are present in far greater num-bers in the ocean than in "inside waters." The Makahs and Quileutes, and certain other tribes, are entitled to fish for halibut in the ocean. All four of the moving tribes may fish only in the inside waters.

It is clear that unrestricted halibut fish-ing in the ocean by the tribes entitled to

fish there will quickly exhaust the entire tribal quota, and prevent the inside tribes from catching any significant number. It has not been established that, in so doing, the ocean tribes would be intercepting any significant number of fish headed for the inside waters. The parties dispute whether halibut migrate in any significant numbers from the ocean to inside waters. It is at least as likely that the ability of the ocean tribes to take the vast majority of the tribal quota arises from the much greater abundance of halibut in their usual and accustomed fishing grounds. If this is the case, the "inside tribes" would be able to take a substantial quantity of halibut only if the court were to cut off fishing by the ocean tribes. The inside tribes could then, perhaps, catch a substantial number of halibut in their relatively barren waters if permitted to continue over a long enough period.

## SUMMARY OF CONCLUSION

The court should deny the motion for a preliminary injunction, and vacate its "Order Closing Treaty Halibut Fishery." The twelve tribes entitle to fish for halibut should be permitted to resume until their total catch reaches the limit set by the IPHC.

## THRESHOLD ARGUMENTS BY MAKAHS

The Makahs present two threshold arguments in opposition to the motion. The court should find neither of them persuasive.

First, they challenge the jurisdiction of this court, asserting they have not waived their sovereign immunity as to regulation of their halibut harvest. The parties' lengthy briefs discuss this issue only sparsely; and they essentially ignored it in oral argument of the motion. The court should not resolve the motion on this basis.

Secondly, they urge that this dispute should be raised, if at all, in another case pending before this court and dealing with the treaty halibut allocation. That case is *Makah v. Mosbacher*, No. 85–1606M, pending before the Hon. Walter T. McGovern. Their argument in this respect is not persuasive. That case apparently involves the overall treaty quota for halibut, not the allocation of that quota among the various tribes. The issues are therefore very distinct. Furthermore, no other tribes are parties to that case. Indeed, there are no parties in that case who could frame the issue of the proper allocation among the tribes.

## IDENTIFYING THE APPLICABLE STANDARDS

While the motion before the court is labelled a "Motion for Preliminary Injunction," the unique nature of this case, and its special circumstances, require the court to apply standards which are somewhat different than those applied in ruling upon a conventional motion for a preliminary injunction. The court has recognized this fact, and has acted accordingly, on myriad other occasions during the long history of this case.

First, the classic function of a preliminary injunction is to preserve the status quo, pending a final determination of the merits by the court. But this is not a meaningful or practical objective in this case. As a practical matter, the court's ruling on this motion will determine, once and for all, how the 1991 treaty halibut quota is to be allocated among the competing tribes. It is not possible to preserve the 1991 halibut harvest until the day in the hazy future when the court determines the general principles which are to govern allocation among tribes of the treaty share. The court's ruling on the motion will be a

final determination, at least as to the 1991 harvest.

█ Next, a crucial standard the courts apply in ruling upon a motion for a preliminary injunction is whether the moving party has shown a likelihood of ultimate success on the merits. In the context of this dispute, that standard must be read to require the moving tribes to demonstrate a congruence between the relief they seek for 1991, and the long-term relief the court is likely to award on allocation generally. In other words, to succeed on this motion, plaintiffs must show what general allocation principles the court is eventually likely to decree; and then show that if those general principles were in place and enforced today, they would produce roughly the specific allocation they propose for 1991.

█ Finally, in ruling upon motions for preliminary injunctions, courts consider the "balance of hardships" between the parties, and any other equitable considerations that arise in the given case. These standards can be meaningfully applied in this case.

### LIKELIHOOD OF SUCCESS ON MERITS

█ What general principles of allocation among competing tribes will the court eventually decree? On the present record, it is impossible to draw any firm conclusions, beyond pure speculation. In their briefing and argument on the pending motion, the parties have advanced many different standards. These include:

The relative quantities of the fish in question taken by the respective tribes at treaty time.

The relative abundance of the fish in each tribe's usual and accustomed fishing area.

The number of members of each tribe who fish for a particular species.

The dollar investment of each tribe in gear designed to catch a particular type of fish.

The number of tribal members economically dependent upon the harvest of a given type of fish.

The catch history of the respective tribes in recent fisheries.

The relative efforts by each tribe in lobbying regulatory agencies, and in pursuing litigation, to increase the total treaty share.

There are no doubt many more such standards. Depending upon which standard or combination of standards is selected, the resulting allocation among tribes will be markedly different.

The court has not as yet placed its imprimatur upon any of the proposed standards. It will be appropriate to do so after a full litigation of sub-proceeding # 86–5. It would be neither fair nor appropriate for the court to adjudicate those standards on a rush basis to rule on a motion in this case. This is especially true because the court has only a limited group of tribes before it. Many others are vitally interested in the determination of the general principles governing allocation of the treaty share.

Without general allocation principles, it is impossible for the court to determine if the proposed limitation of the Makahs to 70% of the tribal share is high, low, or just about right. The moving parties have therefore not shown, and the court cannot determine, whether they are "likely to succeed on the merits," in the sense that their requested allocation for 1991 conforms to the general allocation principles the court is likely to determine.

## BALANCE OF HARDSHIPS

■ The Makahs have demonstrated that they are able, and likely, to catch more than the 70,100 lb. of halibut which the preliminary injunction would allocate to them. They have thus demonstrated they would suffer an economic detriment if the motion were granted.

The four moving tribes, by contrast, have not demonstrated that they would, or even could, catch the 32,400 lb. the injunction would reserve—or any significant portion of that amount. The Makahs point to the very low catch of halibut by the moving tribes in prior years. In fairness, it is probably true that those low catches were in large part attributable to the very large catches by the Makahs and, to some extent, by other tribes. But even disregarding prior years' statistics, the moving tribes have not shown they have the necessary fishermen or gear ready to go; nor have they demonstrated in any other way their capability and intention to take a significant amount of halibut if the injunction is granted.

The moving tribes have therefore failed to show that the balance of hardships tips in their favor.

## OTHER EQUITABLE CONSIDERATIONS

Despite all of the foregoing, the moving tribes make a generalized argument that it is "clearly" inequitable to permit one tribe, the Makahs, to take more than 70% of the allocation to be shared among twelve tribes. While this argument might have a surface appeal, the facts of the 1991 halibut fishery demonstrate that the requested relief would do little, if anything, to improve the lot of the moving tribes.

What has surprised everyone this year is the success of the Quileutes, who are not a moving tribe and whose catch would not be limited by the requested injunction. The catch statistics for 1991 to date are set forth above. They show that, during a period when there was no regulation or court order in place allocating the total treaty share among the tribes, the percentage shares actually taken were:

| | |
|---|---|
| Makahs | 72.6% |
| Quileutes | 25.4 |
| moving tribes | 1.6 |
| Lummi | 0.4 |
| remaining tribes | 0.0 |

Setting aside 10,000 lb. for ceremonial and subsistence purposes, 25,062 lb. remain of the treaty commercial quota. If the court denies the preliminary injunction, and the balance of the halibut are caught in roughly the same proportions as the halibut caught to date, the four moving tribes would take another 401 lb. of halibut.

By contrast, the requested preliminary injunction would permit the Makahs to resume their catch until they reach a total of 70,100 lb. The remaining 11,183 lb. of commercial catch would be allocated among the other 11 tribes. If those tribes took that remainder in the same proportions as their fishing to date, the moving tribes would take about 6.0%, or 671 lb.

In other words, entry of the preliminary injunction is likely to provide about 270 lb. of additional halibut to the moving tribes.

Viewed from another perspective, the Makahs seem headed toward a harvest of 74,415 lb. in the absence of a preliminary injunction. Granting the motion would reduce the Makah's harvest by 4,315 lb. As counsel observed during argument, the real beneficiaries of that reduction would not be the moving tribes, but the Quileutes.

In summary, this analysis indicates that granting the requested relief would do little for the moving tribes, while imposing a much greater hardship upon the Makahs.

## CONCLUSION

For all of the foregoing reasons, the court should deny the motion for preliminary injunction. It might well be that the allocation principles the court will eventually determine will result in halibut shares different from what these tribes will enjoy on a "catch-as-catch-can" basis in 1991. But the moving tribes have not established a legal right to preliminary relief allocating the halibut on any other basis.

As counsel for the Tulalips points out, this sub-proceeding is really just a "subset" of sub-proceeding no. 86–5. No. 91–1 focuses only on halibut, and only on the 1991 season; no. 86–5 concerns allocation generally, of all species and all seasons. The court's ruling on this motion will, as a practical matter, be a final determination as to the 1991 halibut season. If the issues of halibut allocation generally can be raised in this case, they can and should be raised in 86–5.

Accordingly, I recommend the court dismiss this sub-proceeding at this time, without prejudice to any right of the parties to raise these allocation issues in sub-proceeding 86–5.

A proposed order accompanies this Report and Recommendation.

In light of the urgency of the matter, I haves directed all parties to file any responses to this Report and Recommendation within one week after its filing, or by March 29, 1991.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

Subproceeding No. 91–1

(April 13, 1991)

ROBERT E. COYLE, District Judge.

On March 22, 1991, United States Magistrate John Weinberg issued his Report and Recommendation on Halibut Allocation wherein he recommended that the court deny the Motion for Preliminary Injunction filed by the Jamestown Klallam, Lower Elwha Klallam, Port Gamble Klallam, Skokomish Tribes (hereinafter referred to as the Moving Tribes). Magistrate Weinberg also recommended that this court dismiss Subproceeding No. 91–1 without prejudice on the ground that it is a "subset" of Subproceeding No. 86–5.

The Moving Tribes have timely filed objections to the Report and Recommendation. The Makah, the Quinault Nation, the Tulalip Tribes, and the State of Washington each have filed pleadings supporting the Report and Recommendation but suggesting certain revisions to it in the court's order.

The court has reviewed the record herein and concurs in the Report and Recommendation to the extent that it recommends denial of the Motion for Preliminary Injunction for the reasons set forth in the Report and Recommendation. The court does not find the objections of the Moving Tribes or the Quinault Nation persuasive. However, the court does clarify that the terms "treaty entitlement" or "treaty share" are not intended to be dispositive of the actual entitlement pursuant to the Stevens treaties.

The court does not concur with that portion of the Report and Recommendation recommending dismissal of this subproceeding and the incorporation of the halibut allocation issues into Subproceeding No. 86–5.

Accordingly, except as set forth herein, the court adopts the Report and Recommendation on Halibut Allocation and orders that the Motion for Preliminary Injunction is denied.

The Order Closing Treaty Halibut Fishery filed on March 15, 1991 is hereby vacated.

## REPORT AND RECOMMENDATION

Sub–Proceeding Nos. 83–3 and 83–117(T)C

(Oct. 3, 1991)

JOHN L. WEINBERG, United States Magistrate Judge.

### INTRODUCTION

The court has consolidated some of the issues in these two cases, and has referred these consolidated issues to the United States Magistrate Judge. Certain of the consolidated issues have been reserved for later determination. The balance of the consolidated issues have been the subject of pretrial motions and then trial. This Report and Recommendation, and the Proposed Findings of Fact and Conclusions of Law which accompany it, set forth recommendations as to resolution of these issues.

### GENERAL SUMMARY OF LITIGATION

Both cases relate to the fishing rights of two tribes which are federally recognized, but which never entered into treaties specifically reserving fishing rights.

The "Confederated Tribes of the Chehalis Indian Reservation" ("Chehalis Tribe") has a reservation at the confluence of the Chehalis River and the Black River. These rivers are part of the Grays Harbor system. The Shoalwater Bay Tribe's reservation is on Willapa Bay. Each of these reservations was created by an Executive Order, not by treaty. The Chehalis Reservation is within the case area of *U.S. v. Washington*, but the Shoalwater Bay Reservation is not.

The State initiated sub-proceeding 83–3, seeking a determination of these issues:

— Which tribes can take fish from the Chehalis River?

— Which tribes can take fish from the Grays Harbor system?

— That any fish caught by non-treaty tribes are to be charged fully to the "Tribal 50% share," not to the non-Tribal share.

The Chehalis and Shoalwater Bay tribes initiated a separate lawsuit, C83–117(T)C, asking the court to declare that:

— Each tribe may fish on its own reservation.

— Each tribe may fish off its reservation, at its usual and accustomed fishing grounds, based upon aboriginal fishing rights.

— Each tribe may fish off its reservation, because the Executive Orders which established the reservations created or preserved such rights.

— Each tribe may fish at all locations where the Quinault Tribe is entitled to fish, as these two plaintiff tribes are "affiliated" tribes with the Quinaults.

The court has ordered partial consolidation of the two cases, for resolution of only these issues:

— The rights, if any, of these two tribes to fish free of State regulation in the Chehalis River system, the Grays Harbor system, Willapa Bay, the rivers and streams emptying into Willapa Bay, and waters adjacent to Willapa Bay.

— How to allocate the catch of these two tribes

The consolidated issues have been referred to the United States Magistrate Judge. While the matter is pending resolution, the catch of the two tribes is to be

allocated half to the treaty share, and half to the non-treaty share.

Not consolidated or referred, and reserved for later determination in each case, are these issues:

— the rights of these two tribes to catch fish in locations other than those listed above.

— equitable adjustment claims

After a flurry of activity when these cases were filed, the parties asked the court to defer action so they could try to negotiate a settlement. These negotiations continued for a number of years, until the court finally required the parties to conclude a settlement, enter a dismissal, or litigate the issues. They were unable to settle it, and unwilling to dismiss it, and therefore proceeded with discovery, pretrial motions and trial.

Certain of the consolidated issues have been reserved for later determination. They include:

— disputes as to the actual boundaries of the two reservations

— whether the State has authority to regulate whatever fishing rights these tribes might have

— how the catches of these two tribes are to be allocated, between the Treaty and the non-Treaty share

The parties filed six dispositive pretrial motions. The court took these under submission, and indicated it would address the issues raised by the motions in recommending rulings on the merits. Trial was conducted October 15 through 25, 1990. Following the preparation of a transcript of the trial, the parties filed extensive post-trial briefs and proposed findings in February of 1991.

## SUMMARY OF RECOMMENDATION

As set forth in the accompanying Proposed Findings of Fact and Conclusions of Law, the court should rule that these two tribes have no off-reservation fishing rights different from those of any citizen.

Once the court has made a final ruling on the issues addressed at this stage, it should consider remanding the matter to the United States Magistrate Judge for resolution of the three issues (listed above) which were consolidated but reserved for later determination.

Ultimately, the parties and court must address the issues which have not been consolidated, and which remain in the two original cases.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Sub–Proceeding Nos. 83–3 and 83–117(T)C

(October 3, 1991)

JOHN L. WEINBERG, United States Magistrate Judge.

On the basis of the testimony and other evidence admitted at trial, and the arguments of counsel, the following findings of fact and conclusions of law are recommended for adoption and approval by the court.

### FINDINGS OF FACT

#### Identity of Tribes

1. The Confederated Tribes of the Chehalis Indian Reservation ("Chehalis Tribe") is composed of the descendants of Upper Chehalis who settled on the Chehalis Reservation. Membership in the Chehalis Tribe is drawn from the descendants of the Indians listed on the Chehalis Reservation census roll of January 1, 1939,

and descendants of the original allottees of Chehalis Reservation land. Upper Chehalis, Lower Chehalis, Satsop, Cowlitz, or other particular tribal heritage is not a criterion for membership, [Ex. SH/CH–M–243; R. 258–59, 273–76], although the membership of the Chehalis Tribe is largely composed of persons of some degree of Upper Chehalis ancestry. [Ex. USA–M–42 at 1.] Members are not permitted to be enrolled in any other Indian tribe. [Ex. SH/CH–M–243.]

2. The Chehalis Indian Reservation is located near the confluence of the Black and Chehalis Rivers, near the town of Oakville, in Lewis County, Washington. Issues as to the boundary of the Chehalis Reservation are reserved for later determination.

3. The Shoalwater Bay Indian Tribe is composed of the descendants of a small group of Indians of Chinook and Lower Chehalis ancestry who settled on the Shoalwater Reservation. Membership is drawn from the descendants of 11 individuals whose names appear on the voter list for the 1935 Indian Reorganization Act election on the Shoalwater Reservation. [R. 562–63; Ex. SH/CH–M–218.] Chinook or Lower Chehalis ancestry is not a criterion for membership in the Shoalwater Bay Indian Tribe, [Ex. SH/CH–M–76; R. 564], although the membership of the Shoalwater Bay Indian Tribe is largely composed of people of some degree of Lower Chinook and Lower Chehalis ancestry. [Ex. USA–M–42 at 1.] The Shoalwater Bay Constitution also prohibits members from being enrolled in any other Indian tribe. [Ex. SH/CH–M–76.]

4. The Shoalwater Bay Indian Reservation contains approximately 334 acres of land above the ordinary high water mark on the north end of Willapa Bay, in Pacific County, Washington. Whether the reservation boundaries included tidelands or the bed of the bay is reserved for later determination.

5. Neither the Confederated Tribes of the Chehalis Indian Reservation, the Shoalwater Bay Indian Tribe or the aboriginal tribal groups from which their membership is descended are party to the Treaty of Olympia (or Treaty with the Quinault), 12 Stat. 971, or any other ratified treaty with the United States. [Complaint No. 83–117 ¶ 4.5; Ex. USA–M–42 at 1.]

6. The Court has previously found that the Quinault Nation "is recognized by the United States as a currently functioning Indian tribe maintaining a tribal government on the Quinault Reservation and is composed of the Quinault and Queets Band of Indians, and other fish-eating Indians of the Olympic Peninsula who were allotted on the Quinault Reservation." *United States v. Washington*, 384 F.Supp. 312 at 374, FF. 119 (W.D.Wash.1974).

7. The Quinault Nation is a political successor in interest of some of the tribes or bands which were parties to the Treaty of Olympia, *Id.* It possesses adjudicated off-reservation treaty fishing rights. *United States v. Washington*, 384 F.Supp. at 374–75, FF. 120, 121; 459 F.Supp. 1020, 1097 (1978), aff'd, 573 F.2d 1123, 1130–32 (9th Cir.1978); 626 F.Supp. 1405, 1492, 1494 (W.D.Wash.1985), aff'd, 761 F.2d 1419 (9th Cir.1985).

8. Membership in the Quinault Nation is equally open to any individual who has 1/4 or more in the aggregate Quinault, Queets, Quileute, Hoh, Chehalis, Chinook, or Cowlitz ancestry and who is not a member of any other federally recognized tribe. [Ex. QN–M–315; R. 739.] The membership of the Quinault Indian Nation includes a large number of individuals of Chehalis, Chinook, and Cowlitz ancestry. [Ex. QN–M–323A; R. 740.] All enrolled Quinault

tribal members have the same rights, privileges, and obligations. R. 739. Many members of the Quinault Nation who participate in its off-reservation fishery in Grays Harbor and the Chehalis and Humptulips Rivers possess Chehalis or Chinook ancestry. [R. 740–41.]

Claim to Aboriginal Fishing Rights

9. In 1851, Dr. Anson Dart negotiated treaties dealing with several groups of Chinook Indians on the Columbia River and on Willapa Bay. Among those treaties were treaties with the Wahkiakum Chinook, the Lower Chinook, and the "Wheelapa" Chinook. [Ex. W–M–15 (Wheelapa treaty); W–M–16 (Wahkiakum treaty); W–M–11 (Lower Chinook treaty).]

10. The 1851 Dart treaty with the Wheelapa purported to obtain a cession from the last remnants of the Kwalioqua Band of Indians. [Ex. W–M–15.]

11. The 1851 Dart treaties, as written, included certain provisions for a fishing right for the tribes who entered into the treaties. [Ex. W–M–15, 16, 11.] The treaties negotiated by Dr. Anson Dart were never ratified by the Senate and never became a law of the United States of America. [Tr. 816; Ex. USA–M–42 (Lane Written Direct) at p. 10.]

12. Dart's understanding was that he had purchased all of the lands of the various "tribes and bands" of Indians surrounding Willapa Bay and extending up the Columbia River for about 60 miles from its mouth. [Ex. USA–M–42, p. 8 (Also Lane Written Direct at p. 8).]

13. The 1851 Dart treaty with the Wheelapa Band of Chinook and Lower Chinook encompassed the area of Southwest Washington including the lands around Willapa Bay. The Wheelapa treaty made provision for a large general reservation encompassing Willapa Bay region and adjacent lands from the Chehalis River south. [Ex. USA–M–42, p. 3 (Also Lane Written Direct at p. 3; W–M–15 (Wheelapa treaty); W–M–112 (S.Rep. No. 503, 62d Cong., 2d Sess., pp. 2–3).]

14. The "Wheelapa Band of Chinook" were survivors of an Athabaskan speaking enclave who occupied headwaters of the Willapa River and Chinook speakers who occupied the lower reaches of the Willapa River. The "Lower Band of Chinook" included those Chinook bands that occupied Willapa Bay and the streams draining into it as well as those on the lower Columbia. [Ex. USA–M–42, p. 8 (Also Lane Written Direct, p. 8); USA–M–48 (Dart to Lea, 11/7/1851).]

15. The unratified Dart treaties with the "Wheelapa Band of Chinook" and "Lower Band of Chinook" contained land cession provisions [Ex. USA–M–46 (Lower Chinook article 1st); USA–M–47 (Wheelapa Chinook article 1st).] The Wheelapa treaty purported to cede:

The said Wheelapa Band of Indians, hereby cede to the United States, all the land claimed or owned by the said Band. The land intended to be hereby ceded is bounded on the North by lands owned by the Cheehales tribe of Indians, on the East by lands of the Cowlitz Band of Indians, on the South by lands of the Waukikum and Lower Bands of Chinooks, and on the West by the Coast and Shoalwater Bay.

The Lower Chinook treaty purported to cede:

Beginning at the mouth of a certain stream entering Gray's Bay, on the north side of the Columbia River, which stream forms the western boundary of lands, ceded to the United States by the Waukikum Band of Chinooks; running thence Northerly on said western boundary to lands of the Wheelapa Band of Indians; thence westerly along said

lands of the Wheelapa Band, to the Shoalwater Bay; thence Southerly and Easterly following the Coast of the Pacific Ocean and the Northern shore of the Columbia to the place of beginning. The above description is intended to embrace all the lands owned or claimed by said Lower Band of Chinook Indians.

16. In about 1906, Dr. McChesney, working for the Indian Department, was given the task of assembling the rolls of descendants of the Chinook people signatory to the unratified treaties of 1851.

17. On August 24, 1912, Congress appropriated money to compensate the descendants of the signers of the Anson Dart treaties. The 1906 McChesney rolls list the individuals to whom compensation was paid pursuant to the 1912 Act. [Tr. of October 15, 1990, p. 86.] Twenty thousand dollars was paid to the Lower Chinook. Five thousand dollars was paid to the Wheelapa Chinook Indians. Seven thousand dollars was paid to the Wahkiakum Chinook Indians. 37 Stat. 518, 535.

18. A congressional report accompanying the Act of August 24, 1912, reads:

The [Dart] treaties were duly submitted by the President to the Senate for ratification, but they were neither ratified nor rejected. Nevertheless, the Government took possession of both the ceded and reserved lands, and most of them have been disposed of under the public-land laws. The Indians were disposed of all their lands and of all of the rights and privileges granted them by the [Dart] treaties.

[Ex. W–M–112 (S.Rep.503, pp. 2–3).]

19. By appropriating money in the Act of August 24, 1912, to pay the descendants of the Lower Chinook, Willapa, Kwalioqua and Wahkiakum, the Congress confirmed that it had extinguished all aboriginal land title of those Indians. The plaintiff tribes do not hold or possess aboriginal land title of the Lower Chinook, Wheelapa Chinook, Willapa (Kwalioqua), Wahkiakum Chinook, because those rights were taken and the extinguishment was later confirmed by payment under the Act of August 24, 1912. The extinguishment of title to those lands extinguished all fishing rights in those areas. See Conclusions of Law 22 through 35.

20. By appropriating payment in the Act of August 24, 1912 to pay to the descendants of the signers of the unratified Dart treaties with the Lower Band of Chinook and the Wheelapa Band of Chinook, Congress confirmed that it had taken all lands that would have been ceded by the treaties and had extinguished all aboriginal title and any fishing rights related to those lands. The plaintiff tribes do not hold or possess aboriginal fishing rights in the area that would have been reserved or ceded by the Dart treaties, including Shoalwater Bay and its environs, as described in Findings of Fact 12, 13, and 15, above.

21. Between 1854 and 1863, the Washington Territory Surveyor General surveyed approximately 2,800,000 acres. The survey was to prepare for land sales and dispersal of land for settlement by non-Indians. These lands were primarily in the Puget Sound and Southwest Washington area. The survey included all the townships around Grays Harbor and Shoalwater Bay and much of the Chehalis River valley. [Tr. 983–990.]

22. In 1863, Abraham Lincoln issued an Executive order that opened lands in Southwestern Washington for sale or settlement by non-Indians. The opening of lands for sale in 1863 was inconsistent with tribal exclusive use and occupancy of any remaining Indian tribes and extinguished any remaining aboriginal title in Southwest

Washington, including Grays Harbor and Willapa Bay.

23. The Court finds that the United States took the aboriginal title of the Upper and Lower Chehalis, Cowlitz, Chinook, and all other Indians in Southwest Washington by its actions in settling or conveying the lands to non-Indians. That extinguishment occurred not later than 1863.

24. The plaintiff Confederated Tribes of the Chehalis Indian Reservation, along with individual Indians, brought an action before the Indian Claims Commission to ask for compensation for the extinguishment of the aboriginal title of the Upper and Lower Chehalis Indians. [Ex. W–M–126 (Complaint, ¶ X).]

25. The Indian Claims Commission found that the United States had previously extinguished the aboriginal title of the Upper and Lower Chehalis Indians and made a finding as to the land which those groups had held by aboriginal title. [Ex. W–M–129 (8 Ind. Cl. Com. 436).] The parties to the Chehalis Indian Claims Commission proceeding litigated the area of aboriginal title taken but did not litigate the value of that taking. Instead, the claim was settled on an amount of damages of $754,000. [Ex. SH/CH–M–414 (12 Ind. Cl. Com. 644).]

26. The I.C.C. made a specific finding that a Lower Chehalis Tribe held aboriginal title to a certain area, and an Upper Chehalis Tribe held aboriginal title to an adjacent area. [Ex. W–M–129 (8 Ind. Cl. Com. at 461–62).] The I.C.C. found that after abortive treaty negotiations in 1855, that as of March 3, 1855, the United States dealt with all Upper and Lower Chehalis lands as public lands and extinguished the aboriginal title to those lands. [Ex. W–M–129 (8 Ind. Cl. Com. at 462).] In 1964, Congress appropriated money to pay the Chehalis Indian Claims Commission award. P.L. 88–327, 78 Stat. 204 at 213. [Ex. W–M–154.]

27. Congress did not pay the Chehalis Indian Claims Commission award to the plaintiff Confederated Tribes of the Chehalis Indian Reservation nor to the Shoalwater Bay Indian Tribe. Instead Congress charged the Bureau of Indian Affairs with compiling a roll of persons who were descended from the aboriginal Chehalis Indians. 25 U.S.C. § 1151. Congress made the payment to that roll of descendants.

28. The extinguishment of Upper Chehalis and Lower Chehalis aboriginal title found by the I.C.C. included subsidiary Indian groups labelled as the Satsop Tribe, Humptulips Tribes, Hoquiam, Wynoochee, and Wiskah Indians. [Ex. W–M–129 (8 Ind. Cl. Com. at 460).]

29. An individual Indian named Simon Plamondon brought a claim on behalf of the Cowlitz Tribe of Indians. [W–M–138]. The I.C.C. found that a Cowlitz Tribe of Indians once held aboriginal title to lands in Southwestern Washington, and that following the Presidential Proclamation of March 20, 1863, the United States extinguished aboriginal title of the Cowlitz Tribe. [Ex. W–M–138 (25 Ind. Cl. Com. at 441–42).]

30. Upon report of the I.C.C. that it found that aboriginal title of the Cowlitz Tribe had been extinguished without compensation, Congress appropriated funds to pay the award of the I.C.C. [Ex. W–M–154.]

31. Various persons brought a claim to the I.C.C. on behalf of the Chinook Tribe of Indians. The I.C.C. found that a Chinook Tribe of Indians once held aboriginal title to lands in Southwestern Washington, but that the United States had extinguished all aboriginal title to the Chinook Tribe. [Ex. SH/CH–M–86.]

32. Upon report of the I.C.C. that it found that aboriginal title of the Chinook Tribe had been extinguished without fair compensation, Congress appropriated funds to pay the award of the I.C.C. [Ex. W–M–154.]

33. All aboriginal fishing rights of groups to which plaintiff tribes claim successorship were extinguished with aboriginal title.

34. The conduct of the United States government in appropriating money to pay the I.C.C. awards confirms that the United States government had in fact extinguished the aboriginal title of the Upper Chehalis, Lower Chehalis, Cowlitz and Chinook Indians as found by the I.C.C.

35. The plaintiff tribes cannot claim the aboriginal fishing rights of the Upper Chehalis, Lower Chehalis, Humptulips, Satsop, Hoquiam, Wynoochee, Wiskah, Cowlitz, and Chinook Indians because those aboriginal fishing rights, to the extent they once existed, were extinguished with aboriginal land title.

### Claim to Rights Under Treaty with Ouinaults

36. On August 30, 1854, the Acting Commissioner of Indian Affairs notified Governor Isaac I. Stevens of his appointment to negotiate treaties with all tribes in the Washington Territory. *United States v. Washington,* 384 F.Supp. at 354, FF. 17. [Ex. USA–M–52.]

37. The United States' principal purposes were to extinguish Indian claims to the land in Washington Territory and provide for peaceful and compatible coexistence of Indians and settlers, and between settlers and the government. 384 F.Supp. at 355, FF. 19. [R. 103–04, 616.]

38. In December, 1854 and January, 1855, Governor Stevens negotiated the Treaties of Medicine Creek, 10 Stat. 1132;

Point Elliot, 12 Stat. 927; Point No Point, 12 Stat. 933; and Makah, 12 Stat. 939.

39. On February 24, 1855, Governor Stevens arrived on the Chehalis River to hold a treaty council with all of the remaining Indians of Western Washington of which his treaty commission had knowledge, except for part of the Klickitat and Upper Chinook which were not invited. [Ex. USA–M–42 at 16; USA–M–59 at 1; R. 1083.]

40. On February 27, 1855, the Treaty Council was commenced with, representatives of the Upper Chehalis, Lower Chehalis, Cowlitz, Lower Chinook, Quinault and Queets tribes present. [Ex. USA–M–59 at 1–2.] In the proposed treaty presented by Governor Stevens, the United States sought a voluntary cession of the Indians' lands. In exchange for the cession the treaty would have reserved to each of the tribes the "right of taking fish at all usual and accustomed grounds and stations" and provided for the establishment of a reservation to be located between Grays Harbor and Cape Flattery. [Ex. USA–M–59 at 20–21.]

41. Representatives of the Chehalis, Chinook, and Cowlitz objected to being placed on a single reservation north of Grays Harbor and refused to sign the treaty. [Ex. USA–M–42 at 17–20; USA–M–59.] They sought reservations in their own territories and the right to continue fishing at their own fisheries. [Ex. USA–M–42 at 18–20; USA–M–59; R. 102–03.] Only the Quinault and Queets, together with Governor Stevens, signed the offered treaty. [Ex. USA–M–59 at 12, 23.] When it became clear that the other tribes were unwilling to sign, Governor Stevens terminated the treaty council and announced that there would be no treaty. [Ex. USA–M–42 at 20; USA–M–59 at 12–19.]

42. At the Treaty Council Governor Stevens learned for the first time of the

existence of the Quileute and Hoh. [Ex. USA–M42 at 16; USA–M–59 at 1–2; R. 613–14.] Governor Stevens returned to Olympia where, before leaving for treaty negotiations in eastern Washington, he prepared a new treaty draft covering only the Quinault, Quileute, Queets, and Hoh. [Ex. USA–M–42 at 21; R. 106, 115.] The new treaty draft added the Quileute and Hoh as parties. References to the Upper Chehalis, Lower Chehalis, Chinook and Cowlitz, who were not to be party to it, were deleted. The cession area described in the treaty and the amount of money to be paid were amended to reflect the change in parties, and instead of providing for the establishment of a single reservation, it provided for the reservation of a "tract or tracts." [Ex. USA–M–42 at 22; compare Ex. USA–M–59 at 20–23 to Ex. SH/CH–M–266 (12 Stat. 971).] The change allowing the establishment of more than one reservation likely was made in order to avoid a second failure to conclude a treaty in the event the Quileute and Hoh resisted removal to the Quinault Reservation. In fact, the Quileute and Hoh did refuse to leave their territories and separate reservations were eventually established for them. [Ex. USA–M–42 at 23.]

43. Governor Stevens gave instructions to Michael Simmons to obtain the signatures of the Quinaults and Quileutes on the revised treaty. [Ex. USA–M–60.] Simmons met with the Quinault, Queets, Quileute, and Hoh at the Quinault River on July 1, 1855, and obtained their agreement to the Treaty with the Quinault. [Ex. QN–M–133 at 4; Ex. USA–M–42 at 22.] Governor Stevens signed the Treaty in Olympia on January 25, 1856, hence its alternate name, the Treaty of Olympia. [Ex. USA–M–42 at 22.]

44. Governor Stevens also instructed Simmons to advise the other groups who had been at the Chehalis River Council in February, 1855 that he would treat with them further in Olympia. Governor Stevens apparently intended to attempt to negotiate a separate treaty with the Chehalis, Chinook, and Cowlitz groups on his return from eastern Washington. [Ex. USA–M–42 at 23–24; USA–M–60; R. 115–16, 1084–85.] Governor Stevens also appears to have considered the possibility that he would be unable to conclude a treaty with these groups and suggested to the Commissioner of Indian Affairs that in such event Congressional action removing them might be necessary. [Ex. USA–M–42 at 24; USA–M–62.] In contrast to his insistence at the Chehalis River Council that the Chehalis, Chinook and Cowlitz remove to a reservation north of Grays Harbor, Governor Stevens instructed Simmons to advise the Upper Chehalis and Cowlitz that they might be incorporated with the Nisqually, and that the Chinooks, Shoalwater Bay and Lower Chehalis might have their own reservation with fishery and potato grounds. [Ex. USA–M–42 at 24; USA–M–60; R. 1056–58.]

45. Before Governor Stevens could return to conduct further treaty negotiations with the Chehalis, Chinook, and Cowlitz, war broke out and occupied his attention. After the war Congress refused to ratify the treaties that Stevens had already negotiated or pay the expenses of the war. Stevens returned to Washington, D.C. to lobby for ratification of the treaties and funds. The civil war and its aftermath followed. In this unsettled period no further arrangements were made to treat with the Chehalis, Chinook, and Cowlitz and a treaty was never concluded with them. [R. 215–17.]

46. The Treaty with the Quinault was ratified in 1859. [Ex. SH/CH–M–266 (12 Stat. 971).] No evidence was presented that the Senate understood the Treaty to deal with any tribes other than the named

parties, nor is there any evidence to suggest that Stevens, Simmons or any other officer of the United States involved in the negotiation of the Treaty thought it dealt with the Chehalis, Cowlitz, or Chinook. [R. 623–24.] Similarly, there is no evidence to suggest that the Quinault, Quileute, Hoh, or Queets parties to the Treaty thought it dealt with the other tribes who had been at the failed Chehalis River Council. [R. 624.] Moreover, after the negotiation of the Treaty, the Chehalis, Chinook, and Cowlitz thought they were still to be treated with and expressed a desire to treat, [R. 624–25; Ex. W–M–40 at 13], indicating their understanding that the Treaty with the Quinault did not deal with them. [See R. 636.] The general understanding that the Chehalis, Chinook, and Cowlitz were not dealt with through the Treaty with the Quinault is further confirmed by consistent reports of the local agents published in Annual Reports of the Commissioner of Indian Affairs describing these groups as "not treated with," "not party to any treaty" or the like. [See, e.g., EX. QN–M–53 at 334; QN–M–54 at 233; QN–M–55 at 397, 404; QN–M–56 at 422; QN–M–58 at 536; QN–M–60 at 76–79; QN–M–68 at 278; QN–M–77 at 150.]

47. There is no evidence to suggest that the tribes that were parties to the Stevens treaties understood the treaties to provide for the sharing or transfer of the fishing rights among the tribes party to the treaties. [R. 625, 627–8.] Similarly, there is no evidence to suggest that the United States or the tribes party to the Treaty with the Quinault understood it to provide for the transfer or sharing of fishing rights reserved by the tribal parties with tribes not party to the Treaty. [R. 629.]

48. In 1859 it was decided to protect land for the Upper Chehalis and Satsop at the confluence of the Black and Chehalis Rivers and notice was published that a reservation would be established at that location. [R. 631–32; Ex. USA–M–42 at 36; QN–M–163–64.] A portion of this land was eventually set aside as the Chehalis Reservation. [Ex. USA–M–42 at 36.] Instead of a treaty, the Chehalis Reservation was set apart by Secretarial Order of July 8, 1864, after the Commissioner of Indian Affairs advised the Secretary of the Interior that the Chehalis had resisted all suggestions to jointly occupy other reservations. [Ex. USA–M–42 at 38; SH/CH–M–319.] Two years later the Shoalwater Reservation was established by Presidential Executive Order of September 22, 1866. [Ex. USA–M–42 at 39; SH/CH–M–36.] Both Orders are limited to reservations of specifically described lands. They contain no language in any way comparable to the express reservation of off-reservation fishing rights contained in the Stevens treaties.

49. The Treaty with the Quinault does not designate the location of the reservations to be established for the Indian parties. In 1859 after the ratification of the Treaty, Michael Simmons proposed establishment of a reservation encompassing approximately six sections between Point Grenville and the mouth of the Quinault River. [Ex. USA–M–79; QN–M–56 at 419–20.] The reservation was surveyed in 1862. [Ex. USA–M–42 at 26.]

50. In 1871 only the Quinaults were living on the reservation. [Ex. QN–M–68 at 288.] At the time there were only three reservations in southwestern Washington. [Ex. USA–M–42 at 29.] In addition to the three reservation communities there were a number of small bands of Indians who had not moved to any reservation whose tenure was threatened by settlers and land speculators. [Id. at 29–30.]

51. Superintendent Milroy in his 1872 annual report proposed the enlargement of the Quinault Reservation. [Ex. USA–M–42 at 26–28; QN–M–69 at 339–41.] Milroy proposed that the Quileute, Hoh, and Queets, together with other Indians could be collected on the enlarged reservation. [Ex. QN–M–69 at 341.] The Quinault Reservation was enlarged in accordance with Milroy's recommendation by Executive Order of November 4, 1873. [Ex. SH/CH–M–401; QN–M–183.]

52. In the same 1872 annual report proposing enlargement of the Quinault Reservation, Superintendent Milroy also proposed a program for the improvement of the Chehalis Reservation. [Ex. QN–M–69 at 334–35.] It does not appear that the United States intended to relocate people already located on the Chehalis and Shoalwater Bay Reservations to the Quinault Reservation in connection with the 1873 Executive Order. [R. 632–33.]

53. No evidence was presented that the 1873 Executive Order enlarging the Quinault Indian Reservation was intended to grant treaty rights to the Chehalis, Chinook, or Cowlitz. The evidence presented is to the contrary. The Chehalis, Chinook, and Cowlitz received no treaty annuities. [R. 634.] Moreover, because the Chehalis were not party to a treaty providing for allotment of land to individuals, allotment of the Chehalis Reservation was accomplished through an 1886 Executive Order restoring much of it to the public domain so that patents could be issued under the Indian Homestead Acts. [Ex. USA–M–42 at 42–44.]

54. Census data collected in 1878 show 103 Indians belonging to the Shoalwater Bay Reservation, [Ex. USA–M–87], 205 Indians belonging to the Chehalis Indian Reservation, [Ex. USA–M–89], and 164 Indians belonging to Lower Chehalis and Grays Harbor Indians, [Ex. USA–M–88.]

The latter people remained living around Grays Harbor and the lower waters of the streams draining into it and refused to move to a reservation. [Ex. QN–M–74 at 141.] Over time many of the Grays Harbor and Lower Chehalis moved to the Quinault Reservation and assimilated into the Quinault Nation. [Ex. SH/CH–M–316 at 20–21.] Some moved to the Chehalis Reservation, some to the Shoalwater Reservation, and an indefinite number remained scattered around the Harbor. [Id.; R. 161–64.]

55. In 1905, allotment of the Quinault Reservation commenced. [Ex. USA–M–42 at 30.] In June of that year the allotting agent was instructed to take applications for allotment from Quinaults, Quileutes, Queets, Hohs, and members of those tribes which the Central Office had been advised were occupying the Reservation. [Id.; Ex. SH/CH–M–171; R. 637.] In October, the allotment instructions were amended and clarified to restrict allotment at Quinault to Indians having no rights in land on another reservation. [Ex. SH/CH–M–263; USA–M–42 at 31.] Later instructions in 1906 specifically provide that Quileute and Hoh Indians located on the Quileute and Hoh Reservation are not entitled to an allotment at Quinault. [Ex. SH/CH–M–263.]

56. Shoalwater Bay Indians were allotted at Quinault based on the erroneous impression that they were resident on the Quinault Reservation. [R. 639–41.] Indians of the Chehalis, Hoh, and Quileute Reservations, however, were not allotted. [R. 641; Ex. SH/CH–M–263.]

57. Legislation was introduced in 1910, (SB 5269), to authorize allotment of surplus land of the Quinault Reservation remaining after allotment of the Indian residents to Quileute, Hoh, and Ozette Indians desiring allotments at Quinault, rather than at the Reservations set aside for their

own tribes. [Ex. USA–M–42 at 31; QN–M–229.]

58. Subsequently, the Secretary of the Interior proposed an amendment to this legislation to also authorize allotments of surplus Quinault Reservation land to members of "other tribes of Indians in Washington, who are affiliated with the Quinaielt and Quileute Tribes in the treaty of July first, eighteen hundred and fifty-five, and January twenty-third, eighteen hundred and fifty-six...." [Ex. QN–M–252.] The Secretary of the Interior advised the Chairman of the House Committee on Indian Affairs that the amendment was designed principally to provide for allotment of certain unallotted Clallam and Squaxin Island Indians who the Secretary stated "were at one time affiliated with the Indians on the Quinault Reservation." [Ex. SH/CH–M–259.9; QN–M–260.]

59. At the time, both the Squaxin and Clallam had been lobbying for land. [R. 643–45.] The Squaxin and Clallam Tribes are respectively parties to the Treaties of Medicine Creek and Point No Point and each reserved its own right to fish at Squaxin and Clallam usual and accustomed fishing places under those treaties. [R. 646.] See United States v. Washington, 384 F.Supp. at 348–49, 377–78, 459 F.Supp. at 1039–41. The Secretary's description of the Squaxin and Clallam as "affiliated" with the Indians of the Quinault Reservation and his use of the term in the proposed amendment to the allotment bill is not readily explained. [R. 646.]

60. SB 5269 was enacted with the amendment proposed by the Secretary of the Interior added in the House. [Ex. QN–M–333 at 3937; R. 646; SH/CH–M–46, Act of March 4, 1911, 36 Stat. 1345.] The Act provides in its entirety:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled. That the Secretary of the Interior be, and he is hereby, authorized and directed to make allotments on the Quinaielt Reservation, Washington, under the provisions of the allotment laws of the United States, to all members of the Hoh, Quileute, Ozette or other tribes of Indians in Washington, who are affiliated with the Quinaielt and Quileute tribes in the treaty of July first, eighteen hundred and fifty-five, and January twenty-third, eighteen hundred and fifty-six, and who may elect to take allotments on the Quinaielt Reservation rather than on the reservations set aside for these tribes, Provided. That the allotments authorized herein shall be made from the surplus lands on the Quinaielt Reservation after the allotments to the Indians thereon have been completed.

[Ex. SH/CH–M–46, Act of March 4, 1911, 36 Stat. 1345.]

61. The intent of the Act was to authorize Indians whose reservation contained insufficient land for allotment to take allotments from the "surplus land" at Quinault that remained after the allotment of Reservation residents. [Id.; Ex. QN–M–235; QN–M–258; QN–M–252; SH/CH–M–259.9; QN–M–333; R. 684–85.] The legislative history and correspondence relating to the Act of March 4, 1911, do not discuss the Shoalwater Bay or Chehalis Tribes, nor do they discuss the transfer or sharing of treaty fishing rights. [R. 646–47, 684–85.]

62. In 1931, the Supreme Court construed the Act of March 4, 1911, to permit the allotment of Chehalis, Chinook, and Cowlitz Indians from the surplus lands of the Quinault Reservation, if they were without allotment elsewhere. Halbert v. United States, 283 U.S. 753, 760, 51 S.Ct. 615, 75 L.Ed. 1389 (1931). However, only Chehalis who did not have land at the

Chehalis Reservation received allotments at Quinault. [R. 647.]

63. No band or group of Quinault, Quileute, Hoh, or Queets parties to the Treaty with the Quinault merged into or consolidated with the Confederated Tribes of the Chehalis Indian Reservation or the Shoalwater Bay Indian Tribe. [R. 647–48.]

64. The Quinault Indian Nation, Hoh Indian Tribe, and Quileute Indian Tribe are the only Indian tribes recognized by the United States as possessing off-reservation fishing rights reserved pursuant to Article 3 of the Treaty with the Quinault, 12 Stat. 971. [Ex. QN–M–329 at 12.] Both the United States and Quinault Nation take the position that the plaintiff tribes do not possess any fishing rights pursuant to that treaty. [Id.]

Claims Based on Executive Orders

65. During the Indian Wars of 1856, a subagent, Sidney Ford, wrote Governor Stevens a letter describing his efforts to keep the Chehalis peaceful and located around Ford's Prairie. [Tr. 850–51; W–M–40 (10/10/1856 Letter Ford to Stevens, p. 13).] Ford recommended a reservation at that location. On November 30, 1856, Ford wrote Stevens again urging a reservation at the Chehalis River for the Upper Chehalis Indians. Ford recommended a separate reservation for Lower Chehalis Indians and Indians on Shoalwater Bay. [Tr. 851–52; W–M–42.] Both letters demonstrate the Indian agent's concern with whiskey traffic and promoting farming amongst Indians. Sidney Ford renewed these recommendations in 1857. [Ex. QN–M–53 (Report of Sidney Ford 6/30/1857); Tr. 853–54.] By 1857, however, Stevens indicated that he had no instructions to make any treaties with the Cowlitz and Chehalis Indians. [W–M–45 (Stevens to Pomroy 1/31/1857).]

66. After Stevens left Washington Territory in 1857, the Indians remained in the area of the Chehalis River. In 1859, Michael Simmons published a notice in the newspaper advising the public that the government would reserve lands on the Chehalis River for an Indian reservation. [Lane Written Direct, p. 36.] The large reservation described in 1859 was not made. While proposing a reservation at Chehalis River, Simmons made it clear that the reservation would not be suited for Chinook and Lower Chehalis Indians who had previously lived near the seashore. [Ex. SH/CH–M–257 (Letter Simmons to Geary 7/1/1860).] No lands were reserved in 1860.

67. In June 1862, the new Superintendent of Indian Affairs for Washington Territory, Hale, began an effort to deal with the non-treaty Upper Chehalis Indians. On July 3, 1862, Hale wrote to Commissioner of Indian Affairs Dole and reported that the Chehalis would not consolidate with the Nisquallys. He did report that they would enter into a treaty and take a reservation of about four sections of land at the confluence of the Black and Chehalis Rivers. Hale urged the Commissioner of Indian Affairs to authorize a treaty with those Indians. [Tr. 857–58; W–M–59 (6/3/1862, Letter Hale to Dole); SH/CH–M–264.5 (7/3/1862 Letter Hale to Dole).]

68. Hale did not get an immediate response from Commissioner of Indian Affairs Dole and in March of 1863, he reported that he was locating Upper Chehalis Indians at the confluence of the Black and Chehalis Rivers. [Tr. 860–61; W–M–63 (3/30/1863 Letter Hale to Dole).] In 1863, however, Hale substantially changed the nature of his recommendation and recommended no treaty or treaty promises. He wrote:

For the lands necessarily taken from them the government should evince its magnanimity in making ample provision

for their protection and welfare. I do not, therefore, propose to have any treaty made either with the Chehalis or Colville or any other Indians within the bounds of this superintendency who have yet been made parties to any treaty. What may be done for these Indians in the way of providing an agent to take care of and employees to instruct them ... will be more kindly received by them, and considered as presents and favors, to be given or withheld at pleasure, instead of a consideration which they have the right to expect and demand. In this way, too, we shall avoid the violation of treaty stipulations. Some such courses I have thus indicated will, I believe, be more satisfactory to the Indians themselves, and will in the end be more safe and economical to the department.
[Ex. QN–M–59, p. 442 (9/1/1863 Report Hale to Dole).]

69. Hale arranged for a survey and description of his proposed Chehalis Indian Reservation. [Ex. QN–M–59, p. 443.] The description was forwarded to Commissioner of Indian Affairs Dole. On May 17, 1864, Commissioner Dole recommended to the Secretary of Interior that he reserve lands recommended by Superintendent Hale. [Ex. SH/CH–M–335 (5/17/1864 Letter Dole to Secretary of Interior).] The recommendation of Commissioner of Indian Affairs Dole clearly referred to the recommendations and proposals that had been approved by Superintendent Hale.

70. In reserving lands for the Chehalis Indian Reservation, the Secretary of Interior had no intention to impliedly create a treaty right.

71. In reserving lands for the Chehalis Indian Reservation, the overwhelming motivation was to secure lands for the Indians before the lands were settled by non-Indians. That the United States recognized the validity of non-Indian settlements is demonstrated by the fact that the United States paid for the private land claim of D. Mounts, which was within the six sections of land reserved for the Chehalis Indian Reservation. [1 Kapler 903 (7/8/1864 Secretarial Order).] The year before the order reserving lands for the Chehalis Reservation, Superintendent Hale reported that he had surveyed boundaries for a reservation.

But the most serious defect of all is, that no official information of the recognition and approval of any of the Indian reservations by the President or the Department [of Interior] has been given to the Commissioner of the General Land Office, so as to enable him to instruct the proper officers here to reserve the same from entry [by non-Indians], The difficulty became very manifest when the lands were offered for public sale. ... Unless different instructions on this point are given by the Commissioner, the difficulty may be very soon revived, as parties are not infrequently applying to enter lands which are included within the bounds of our Indian reservation.
[Ex. QN–M–59 (9/1/1863 Report Superintendent Hale to Commissioner Dole).] The express motivation for the July 8, 1864 Secretarial Order reserving lands for the Chehalis Indians was to reserve the lands from entry by non-Indians. The order addressed the problem of landless Indians and showed no intention to deal with tribal off-reservation rights.

72. In recommending the Chehalis Indian Reservation to the Secretary of Interior, Commissioner Dole expressly stated that "it will also be necessary, doubtless, to make some provision for them after they shall have been assured of the quiet and permanent possession of the proposed reservation for a future home. But this may subsequently receive the attention of the

Department. These Indians are represented to be a very hopeful condition. They wish to abandon a roving life; to establish themselves in houses and cultivate their lands; to educate their children, and live peaceably with all." [1 Kapler 902; SH/CHHM–315 (5/17/1863 Letter Commissioner Dole to Secretary of Interior).] That the lands would be cleared and farmed and that the United States had not made all provisions demonstrates that there was no United States intent to create or reserve any off-reservation fishing right by implication.

73. Indians of Southwest Washington had relied upon fish long before the arrival of non-Indians. The location for the Chehalis Indian Reservation had referred to the proximity of fish in the Chehalis River. The fact that the United States considered the proximity of fisheries does not demonstrate the United States' intent to create an off-reservation fishing right for the eventual occupants of the Chehalis Indian Reservation.

74. The Executive Order creating the Chehalis Reservation must also be viewed in the context of the acculturation policy that pervaded United States Indian Policy at the time. The United States intended to "civilize" Indians by teaching them cultivation and ways of non-Indian society. Although fishing is not inconsistent with farming or joining non-Indian society, the creation of a tribal off-reservation fishing right is inconsistent with the intention of making a reservation for farming and eventual allotment to individual Indians. [Tr. 864–65; Ex. QN–M–60 (Annual Report including Letter of Superintendent Hale 8/8/1864, p. 58, and Letter of Dole to Secretary of Interior 5/17/1864, p. 77–78).]

75. The Executive Order reserving lands for the Chehalis Indians was not conditional or based upon agreement with the Indians. The Upper Chehalis Indians at that location did not believe or understand that they were obtaining a treaty or treaty rights, nor did they believe they were obtaining any off-reservation fishing right from the United States.

76. There is less written record concerning the reservation of lands for the Shoalwater Bay Indian Reservation. A May 2, 1866, letter from Giles Ford to the new Superintendent of Indian Affairs, Waterman, reports that he had visited Shoalwater Bay and examined a spot that the Indians wanted reserved. He reported that it would be a good home for them being situated in close proximity to good fishing, hunting, and grazing grounds. He recommended that it be immediately reserved from sale. [Ex. SH/CH–M–34; Tr. 870.] Superintendent Waterman enclosed Giles Ford's letter and supported his recommendation in a June 1, 1866, letter to the Secretary of the Interior. [Ex. SH/CH–M–35.] Waterman submitted a map of the proposed reservation.

77. The primary purpose of the Shoalwater Bay Reservation was to reserve lands for Indians and prevent the lands from being taken by non-Indians. Superintendent Waterman's letter stated "they desire a place upon a shore where they can fix their homes, without being exposed to being supplanted and driven off by White men." [Ex. SH/CH–M–35.] The Executive order reserving lands was executed September 22, 1866, by President Andrew Johnson. The order is handwritten on a map of the reservation. The language of the Executive Order expressly refers to the need to reserve the land from sale:

> Let the tract of land as indicated on the within diagram be reserved from sale and set apart for Indian purposes...

[Ex. SH/CH–M–37.]

78. There is no express intent by the Executive to create or reserve any off-

reservation fishing right for Indians who might occupy the Shoalwater Bay Reservation. There is no express or implied intent that a treaty right was being reserved or created for Indians who might later occupy the reservation.

79. Superintendent Waterman referred to 30 or 40 families who had lived upon the beach. Those Indians did not understand that they were entering a treaty or obtaining any off-reservation fishing rights. There is no indication that the United States thought it was dealing with a tribe or a group with tribal rights in 1866.

80. There was no executive intent or United States intent to create or reserve off-reservation fishing rights for any group of Indians or for the eventual occupants of the lands reserved on Shoalwater Bay. That the lands were proximate to fishing and other resources was a factor in selecting the location, but this does not amount to the creation of a special off-reservation fishing right.

81. The Shoalwater Bay Indian Reservation appears to have been overlooked by the local superintendent. The reservation is not mentioned in the annual reports. [Ex. QN–M–69 (1872 Report).] The 1872 Annual Report recognizes a Chehalis Indian Reservation and indicates that Indians of the Cowlitz, Chinook, Shoalwater Bay, and Humbolt Tribes did not occupy the Chehalis Reservation. In a letter dated September 2, 1876, Superintendent Milroy wrote to Commissioner of Indian Affairs Smith and stated:

I have during the past month visited the reservations under may [sic] charge, including the Shoalwater Bay Reservation. It was set apart as an Indian reservation by Executive Order of September 22, 1866—near ten years ago. But its existence as an Indian reservation was unknown to any officer of the Indian Bureau in this Territory until I accidentally

discovered it a short time before the abolishing of my office as Superintendent of Indian Affairs of this Territory; and my visit during August this past past [sic] was the first visit ever made to it by any officer of the Indian Bureau. It consist [sic] of about 340 acres; about one third of which is good agricultural land; but it is heavily timbered. I found but two families residing on the reservation. I sent word in advance for all the Indians instructed on that reservation to meet with them on the 19th and about 50 men, women and children met me there at that time and I had a long conference with them. Their reasons for not coming onto the reservation heretofore was that they were uncertain about their title to it, but did not have a chief in whom they had confidence.

[Ex. W–M–90 (Letter, Milroy to Commissioner of Indian Affairs 9/2/1876).]

82. There is no evidence or indication that any Indians understood the 1866 Executive Order to be creating or reserving off-reservation rights associated with the Shoalwater Bay Reservation.

83. In the annual reports following 1864 and 1866, the United States never took the position that Indians of the Chehalis or shoalwater Bay Indian Reservations had off-reservation fishing rights. The United States consistently took the position that they were non-treaty Indians and did not have treaty rights. In particular, the Solicitor's office in 1942 took the position that Chehalis Indians had no special off-reservation rights. [Ex. SH/CH–M–116 (Swindell Report).] In 1952, the Solicitor's Office took the position that members of the Chehalis Tribe must comply with state laws and regulations outside the boundaries of their reservation. [Ex. W–M–124, p. 3.] In 1975, the Regional Solicitor took the position that the Chehal-

is Tribe had no off-reservation fishing rights. [Ex. W–M–142.]

84. The subsequent interpretation of the United States confirms that there was not United States intent to create or reserve any off-reservation fishing rights with the Executive Orders reserving lands for the Chehalis and Shoalwater Bay Indian Reservations.

85. Although the Annual Reports of the Commissioner of Indian Affairs referenced treaty fishing rights, those reports distinguish Chehalis and Shoalwater Bay Indians as non-treaty, and never indicate or imply that Chehalis or Shoalwater Bay Indians possess some other type of fishing right. [E.g., Ex. QN–M–89, p. 462 (discussing treaty fishing).]

## CONCLUSIONS OF LAW

### On–Reservation Fishing Rights

1. The Chehalis and Shoalwater Bay Tribes are entitled to fish within their respective reservations. Issues as to the boundaries of those reservations, and as to authority to manage that fishing, have been deferred until the next stage of this litigation. The balance of these Conclusions of Law address the rights of these tribes to fish off their respective reservations.

### Claims to Rights Under Treaty with Quinaults

■ 2. The Chehalis and Shoalwater Bay Tribes who claim that they have acquired a share of Quinault treaty rights bear the burden of proof with respect to their claims. They have "the burden of proving that they are entitled to exercise tribal treaty rights." See United States v. Washington, 641 F.2d 1368, 1374 (9th Cir. 1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982); see also United States v. Suquamish Indian Tribe, 901 F.2d 772, 775 (9th Cir.1990); United

States v. Lummi Indian Tribe, 841 F.2d 317, 318 (9th Cir.1988).

■■ 3. "A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations.... Accordingly, it is the intentions of the parties ... that must control any attempt to interpret the treaties." Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675–76, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); Swim v. Bergland, 696 F.2d 712, 716 (9th Cir.1983). Where as in this case the parties to the treaty agree on the meaning of the treaty, the Courts must generally defer to their interpretation. Sumitomo Shoji, America, Inc. v. Avagliano, 457 U.S. 176, 184, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).

4. The refusal of the Chehalis, Chinook, and Cowlitz to sign the treaty offered at the Chehalis River Council; Governor Stevens' subsequent removal of the Chehalis, Chinook, and Cowlitz from the Treaty negotiated with the Quinault and Quileute at the Quinault River in July 1855; and, his instructions to Michael Simmons that the other tribes who had been at the Chehalis River Council would be the subject of later, separate treaty negotiations confirm that the Treaty with the Quinault itself was not intended to, and did not, deal with the Chehalis, Chinook, and Cowlitz or grant them a share of the fishing rights reserved by the Quinault.

5. Both this Court and the Court of Appeals have held that a consolidation or merger of tribal groups is required for one tribe to obtain the treaty fishing rights of another tribe under the Stevens' treaties. See United States v. Washington, No. 9213 Sub No. 85–1, Order Adopting the Special Master's Report and Recommendation, entered February 27, 1989 (Docket No. 11202), aff'd sub nom. United States v.

*Suquamish Indian Tribe,* 901 F.2d 772 (9th Cir.1990). The Court of Appeals affirmance states that for one tribe to acquire the treaty fishing rights of another tribe,

> it must first show that the two tribes or cohesive bands thereof consolidated or merged and demonstrate also that together they maintain an organized tribal structure.[11]

11. A tribe must also show that it 'descended from a treaty signatory.' *Washington,* 641 F.2d at 1371. In this instance, however, the district court previously determined that the Suquamish and Duwamish were treaty signatories and that the contemporary Suquamish descended from the treaty time Suquamish.

*United States v. Suquamish Indian Tribe,* 901 F.2d 772, 776 (9th Cir.1990). (Footnote in original.)

■ 6. The Chehalis and Shoalwater Tribes have not made the required showing. The Confederated Tribes of the Chehalis Indian Reservation and the Shoalwater Bay Indian Tribe are neither "descended from a treaty signatory," nor tribal entities formed by the consolidation or merger of non-treaty groups with any band of Quinault, Queets, Hoh or Quileute. They therefore do not possess rights under the Treaty with the Quinault unless the United States, through some post-treaty action, appropriated those rights for the benefit of the two tribes.

■ 7. In assessing post-treaty actions, the Court notes that the appropriation of the property of a tribe by the United States for the use of another tribe is a taking. *Shoshone Tribe v. United States,* 299 U.S. 476, 497, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *United States v. Creek Nation,* 295 U.S. 103, 109–111, 55 S.Ct. 681, 79 L.Ed. 1331 (1935). The Supreme Court has cautioned that acts of Congress are not to be construed to transfer proper-ty rights of one tribe to another where an alternate construction is available. *Chippewa Indians v. United States,* 301 U.S. 358, 375–76, 57 S.Ct. 826, 81 L.Ed. 1156 (1937). To conclude that the United States took Quinault rights and thereby diminished Quinault rights for the benefit of other tribes, the Court must find that Congress acted expressly, see, *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), or at a minimum that Congress clearly considered the matter and chose to diminish or modify Quinault treaty rights. *United States v. Dion,* 476 U.S. 734, 106 S.Ct. 2216, 2220, 90 L.Ed.2d 767 (1986).

8. Neither the Executive Order of November 4, 1873 enlarging the Quinault Indian Reservation, nor the Act of March 4, 1911 providing for the allotment of the Quinault Reservation, constitutes Congressional action of the kind necessary to transfer Quinault off-reservation treaty fishing rights from the Quinault to the Chehalis and Shoalwater Tribes.

9. This Court has previously held joint occupancy of a reservation is not sufficient to demonstrate the tribal consolidation and unification necessary for a transfer of treaty fishing rights among tribes. See, *United States v. Washington,* Sub. No. 85–1, Order Adopting Special Master's Report and Recommendation, entered Feb. 27, 1989, n. 4 at 19 (Docket No. 11202), aff'd, sub nom. *United States v. Suquamish Indian Tribe,* 901 F.2d 772 (1990). Thus, even if the 1873 Quinault Executive Order had been intended to effect the relocation of the Chehalis and Shoalwater Tribes from the Chehalis and Shoalwater Reservations to the Quinault Reservation, that would not support a conclusion that the two tribes had acquired Quinault off-reservation treaty fishing rights. Moreover, there is no mention of off-reservation treaty fishing rights in the Executive Order

which would support a conclusion that the Order effected a transfer of treaty fishing rights.

10. The Act of March 4, 1911, and its legislative history do not reflect any Congressional intent to appropriate Quinault off-reservation treaty fishing rights and transfer a share of those rights to the Chehalis and Shoalwater Bay Tribes. In the absence of a clear and unequivocal expression of such intent, allotment of Quinault Reservation land to individual Chehalis and Shoalwater Indians does not support the conclusion that Quinault off-reservation treaty rights were transferred to the Chehalis and Shoalwater Bay Tribes. See *United States v. Washington,* Sub. No. 85–1, Order Adopting Special Master's Report and Recommendation, entered Feb. 27, 1989, FF. 396 at 11–12 (Docket No. 11202), aff'd, sub nom. *United States v. Suquamish Indian Tribe,* 901 F.2d at 777 (9th Cir.1990).

11. The Chehalis and Shoalwater Tribes claim that prior case law has conclusively determined that the Executive Order of 1873 enlarging the Quinault Indian Reservation and the Quinault Allotment Act of March 4, 1911, transferred Quinault treaty fishing rights to the plaintiff tribes through a process of "post treaty affiliation." For the reasons that follow, the Court disagrees.

12. The cases upon which the Chehalis and Shoalwater rely include: *Halbert v. United States,* 283 U.S. 753, 51 S.Ct. 615, 75 L.Ed. 1389 (1931); *Wahkiakum Band of Chinook Indians v. Bateman,* 655 F.2d 176 (9th Cir.1981); *Williams v. Clark,* 742 F.2d 549 (9th Cir.1984); *Confederated Tribes of the Chehalis Indian Reservation v. Lujan,* 129 F.R.D. 171 (W.D.Wash.1990), affirmed, 928 F.2d 1496 (9th Cir.1991); *Quinaielt Tribe of Indians v. United States,* 102 Ct.Cl. 822 (1945).

13. The prior decisions cited by the Chehalis and Shoalwater Bay Tribes cannot be accorded a preclusive effect in this matter because the issues decided in the prior cases differ from the issue presented here.

14. The issues in *Halbert* as framed by the Supreme Court were:

The plaintiffs are all of Indian blood and descent, but none is a full-blood Indian. Some are members of the Chehalis, Chinook, and Cowlitz tribes, and the question is presented whether these tribes are among those whose members are entitled to allotments from lands within the Quinaielt Reservation. Many do not personally reside on the reservation, and we are asked to decide whether this defeats their claim. Some are the issue, either children or grandchildren, of a marriage between an Indian woman and a white man, and whether this is an obstacle to allowing their claims is a further question.

*Halbert v. United States,* 283 U.S. 753, 755–56, 51 S.Ct. 615, 75 L.Ed. 1389 (1931). The decision holds that individual Chehalis, Chinook, and Cowlitz are entitled to allotments of land on the Quinault Reservation if without allotments elsewhere, that reservation residence is not a precondition for allotment, and that the issue of marriages of Indian women and white men are not necessarily barred from taking an allotment.

15. The Court's determination that individual Chehalis, Chinook, and Cowlitz are entitled to allotments turns on its construction of language in the Quinault Allotment Act of March 4, 1911, authorizing the issuance of allotments,

"to all members of ... tribes of Indians in Washington who are affiliated with the Quinaielt and Quileute tribes in the treaty [with the Quinault, 12 Stat. 971], and who may elect to take allotments on

the Quinaielt Reservation rather than on the reservations set aside for these tribes, Provided, That the allotments authorized herein shall be made from the surplus lands on the Quinaielt Reservation after the allotments to the Indians thereon have been completed."

Act of March 4, 1911, 36 Stat. 1345. *Halbert*, 283 U.S at 758–59, 51 S.Ct. 615. The Court held it was appropriate to speak of the Chehalis, Chinook, and Cowlitz, as "affiliated under the treaty" for the purpose of determining the eligibility of individuals for allotment of land under the Act. The Court was not presented with, nor did it address, the claim made here by the Chehalis and Shoalwater Bay Tribes that they share and may independently exercise the tribal off-reservation fishing rights reserved by the tribes party to the treaty.

16. The conclusion that *Halbert* did not involve an issue of tribal fishing rights is strengthened by several factors. The unpublished district court decision in *Halbert* makes it clear that the case involves only individual claims to allotment and does not implicate a claim by a tribe to tribal rights. Indeed, the district court's decision concludes that the Chehalis and Chinook at Oakville and Shoalwater, the locations of the Chehalis and Shoalwater Reservations, were not tribes. [Ex. QN–M–99 at 25–26.] This conclusion contradicts the suggestion of the Chehalis and Shoalwater Tribes that *Halbert* involved an issue of tribal property rights. Moreover, Judge Cushman, the district judge who heard *Halbert*, subsequently had occasion to address the question of Chinook tribal fishing rights and concluded that the Chinook "have no such rights" under the treaty. *United States v. McGowan*, 2 F.Supp. 426, 438–39 (W.D.Wash.1931), aff'd, 62 F.2d 955 (9th Cir.1933), aff'd per curiam, 290 U.S. 592, 54 S.Ct. 95, 78 L.Ed. 522 (1933). (Emphasis added.) The *McGowan* decision indicates that this Court did not view *Halbert*

as holding that so-called "affiliated tribes" possess Quinault treaty fishing rights, as a consequence of that characterization.

17. In *Wahkiakum Band of Chinook Indians v. Bateman*, 655 F.2d 176 (9th Cir.1981), a group claiming to be a successor to the aboriginal Wahkiakum Band of Chinook claimed rights to fish at Chinook usual and accustomed fishing places on the Columbia River under the Treaty with the Quinault. The court rejected the claim, holding that the Treaty with the Quinault only protected and reserved the right to take fish at the fishing grounds of the tribal parties, the Quinault and Quileute, and that the Wahkiakum do not possess standing as a treaty signatory. *Id.* at 179.

18. The *Wahkiakum* court did not have before it the question of Chinook claims to a right to fish at Quinault fishing places. Nevertheless, in dictum, the court stated:

> As members of a tribe subsequently affiliated with the Quinault under the treaty, they are, however, entitled to share such rights as are granted to the original signatories by the treaty. The members of the Wahkiakum, a tribe of fish-eating Indians of the locality, have the opportunity to take an allotment on the Quinault Reservation and to exercise the fishing rights which accompany that allotment. Those fishing rights are secured by Article III which protects the rights of the Quinault and any affiliated tribe to fish at all usual and accustomed Quinault fishing grounds. (Footnote omitted.)

655 F.2d at 179–80.

The Court thus suggests that only individual members who take an allotment on the Quinault Reservation are entitled to exercise Quinault treaty fishing rights. This would not support the far broader claim by the Chehalis and Shoalwater Bay Tribes that all of their members share

those Quinault fishing rights. In any event, the above statement by the *Wahkiakum* court was dictum. "It is hornbook law that both [collateral estoppel and stare decisis] principles give effect only to matters that have formed an essential basis for the earlier decision." *Matter of Ellis,* 674 F.2d 1238, 1250 (9th Cir.1982); *United States v. Crawley,* 837 F.2d 291, 292 (7th Cir.1988). The dictum comments of the Court of Appeals are consistent with a requirement that individual Chehalis and Shoalwater enroll in the Quinault Indian Nation if they desire to exercise Quinault treaty rights, an avenue which is available to any person who possesses at least 1/4 Chehalis, Chinook, or Cowlitz ancestry.

19. The other cases upon which plaintiff tribes rely are also distinguishable. *Williams v. Clark,* 742 F.2d 549 (9th Cir. 1984), cited by the Chehalis and Shoalwater Bay Tribes, involves a claim with respect to a Quileute's rights to inherit from a Quileute decedent an interest in land located on the Quinault Reservation. The Quileute Tribe, unlike the plaintiff tribes, is a party to the Treaty with the Quinault.

*Confederated Tribes of the Chehalis Indian Reservation v. Lujan,* 129 F.R.D. 171 (W.D.Wash.1990), affirmed, 928 F.2d 1496 (9th Cir.1991), involves claims by the plaintiff Chehalis and Shoalwater Tribes with respect to the government of the Quinault Reservation. This Court dismissed that case based on the inability of the plaintiffs to join an indispensable party, the Quinault Indian Nation. It therefore expressly declined to address the merits.

Finally, *Quinaielt Tribe of Indians v. United States,* 102 Ct.Cl. 822 (1945), involved a claim by the Quinault Nation against the United States for money damages as the result of the wrongful exclusion of certain lands from the Quinault Reservation. The Claims Court in an interlocutory decision relying on *Halbert,* held that others shared in the right to recover for the wrongfully omitted reservation lands. The decision does not address the issue of off-reservation fishing rights presented in this case and is readily explained on the basis that had the excluded lands been properly included in the Quinault Reservation they would have been available for allotment to individual Chehalis, Chinook, and Cowlitz allottees under *Halbert.*

20. Based on the foregoing, the Court concludes that the Confederated Tribes of the Chehalis Indian Reservation and the Shoalwater Bay Indian Tribe do not share the right reserved by the Quinault in the Treaty with the Quinault to take fish at Quinault usual and accustomed fishing places.

Claims Based on Executive Orders

21. Off-reservation hunting and fishing rights must be expressly reserved. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *Organized Village of Kake v. Egan,* 369 U.S. 60, 75–76, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). Absent an express reservation of off-reservation rights, Indians engaging in activities beyond reservation boundaries are generally subject to regulation under non-discriminatory state law applicable to all citizens. *Mescalero Apache Tribe v. Jones,* 411 U.S. at 148–49, 93 S.Ct. 1267. The Executive Orders establishing the Chehalis and Shoalwater Bay Reservations do not contain the express reservation of off-reservation fishing rights necessary to preserve such rights.

Claims to Aboriginal Fishing Rights

22. Aboriginal title is the right of aboriginal Indian tribes to use and occupy lands which they have continuously and exclusively used and occupied.

23. The right of use and occupancy under aboriginal title included the right to use aboriginal lands for fishing. The right to fish is an incident of aboriginal title.

24. The extinguishment of aboriginal title extinguishes all incidents of aboriginal title and any use rights such as fishing in the aboriginal lands, unless expressly reserved by treaty or federal law.

25. When Congress appropriated money to pay an award of the Indian Claims Commission for the past extinguishment of aboriginal title, Congress confirmed that the aboriginal title of the group to whom the award was made was in fact extinguished.

26. By appropriating money to pay the I.C.C. award for the extinguishment of aboriginal title of the Upper Chehalis, Lower Chehalis, Satsop, Humptulips, and other Indians who made the claim in *Upper Chehalis Tribe, et al. v. United States,* I.C.C. docket No. 237, Congress confirmed that the aboriginal title of those aboriginal Indians had been extinguished.

27. By appropriating money to pay the I.C.C. award for the extinguishment of aboriginal title of the Cowlitz Indians who made the claim in *Plamondon ex. rel. Cowlitz Tribe v. United States,* I.C.C. docket No. 218, Congress confirmed that the aboriginal title of those aboriginal Indians had been extinguished.

28. By appropriating money to pay the I.C.C. award for the extinguishment of aboriginal title of the Chinook Indians who made the claim in *Chinook Tribe and Band v. United States,* I.C.C. docket No. 234, Congress confirmed that the aboriginal title of those aboriginal Indians had been extinguished.

29. By appropriating money to pay the award of the I.C.C, Congress confirmed that the United States had extinguished aboriginal title, including any aboriginal fishing rights, of the aboriginal tribes whose aboriginal title was found to have been taken in an I.C.C. award.

30. Plaintiff tribes did not show that any incident of aboriginal title or fishing right was expressly or otherwise exempted from the extinguishment of the aboriginal title of the Upper Chehalis, Lower Chehalis, Satsop, Humptulips, Cowlitz, Chinook, or any other aboriginal Indian tribe where the extinguishment has been confirmed by the payment of an award of the I.C.C. Plaintiff tribes do not possess any unextinguished aboriginal fishing rights of those aboriginal tribes.

31. The Act of August 24, 1912, paid compensation to the descendants of the signatories of the unratified 1851 treaties with the Wahkiakum Band of Chinook, the Wheelapa Band of Chinook, and the Lower Band of Chinook. By the Act of August 24, 1912, Congress confirmed that it had previously extinguished all aboriginal title, including fishing rights, of the Wahkiakum Band of Chinook, Wheelapa Band of Chinook, the Kwalioqua, and the Lower Band of Chinook. Plaintiff tribes do not possess any unextinguished aboriginal fishing rights of these aboriginal tribes.

32. The Act of August 24, 1912, paid compensation to the descendants of the signatories of the unratified 1851 treaties with the Wahkiakum Band of Chinook, the Wheelapa Band of Chinook, and the Lower Band of Chinook. By the Act of August 24, 1912, Congress confirmed that it had extinguished all aboriginal title, including fishing rights, in the lands that would have been ceded or reserved under those treaties, including Shoalwater (or Willapa) Bay and its environs, for a distance of 60 miles up the Columbia River. Plaintiff tribes do not possess aboriginal title and fishing rights to the lands that would have been

ceded or reserved under those treaties, including Shoalwater (or Willapa) Bay and its environs, for a distance of 60 miles up the Columbia River.

33. The opening of lands for sale to non-Indians and to possession by non-Indians was inconsistent with continued exclusive use and occupancy by the aboriginal tribes and, to the extent that aboriginal title was not extinguished previously, the presidential proclamation of 1863 extinguished all remaining aboriginal title in southwest Washington including any aboriginal fishing rights that may have existed. Plaintiff tribes do not possess any unextinguished aboriginal fishing rights in southwest Washington.

34. Plaintiff tribes did not prove that they possess any unextinguished aboriginal fishing rights and the court hereby declares that they do not have a right to take fish free of state regulation off their respective reservations in the Chehalis River and Gray's Harbor systems, nor in Willapa Bay, nor the rivers and streams draining into that bay, nor the waters adjacent to that bay.

35. Because the Court concludes that the Chehalis, Chinook, and Cowlitz retained no aboriginal rights to fish outside of the Chehalis or Shoalwater Reservations, it is unnecessary for the Court to determine the usual and accustomed fishing places of those groups, or to which, if any, of those groups the Chehalis and Shoalwater plaintiffs are successors in interest.

### Summary

36. The rights of the Chehalis Tribe and the Shoalwater Bay Tribe to fish off their respective reservations are the same as the rights of every other citizen. They enjoy no additional rights by virtue of the Executive Orders establishing their reservations, or the aboriginal rights of any tribe, or any relationship with the Quinault Indian Nation.

### ORDER RE REPORT AND RECOMMENDATION FILED ON OCTOBER 3, 1991

Subproceeding No. 83–3 and No. 83–117T(C)

(May 18, 1992)

ROBERT E. COYLE, District Judge.

On October 3, 1991, United States Magistrate John Weinberg filed his Report and Recommendation and accompanying Proposed Findings of Fact and Conclusions of Law.

Timely objections and memoranda have been filed by the Shoalwater Bay and Chehalis Tribes. In addition, the Quinault Nation and the Tulalip Tribes of Washington each have timely filed limited objections and memoranda. The State of Washington and the United States also have filed pleadings responding to the arguments made by the respective tribes in their objections and/or memoranda.

The court has reviewed the pleadings, record, objections and memoranda in accordance with the governing standards of review. The court concludes that further oral argument in connection with these matters is not necessary.

Upon due consideration of the arguments of the parties and the record herein, the court vacates the proposed Findings of Fact Nos. 2, 19, 20 and 74 and substitutes therefore:

2. The Chehalis Indian Reservation is located near the confluence of the Black and Chehalis Rivers, near the town of Oakville, in Thurston and Grays Harbor Counties, Washington. Issues as to the boundary of the Chehalis Reservation are reserved for later determination.

19. By appropriating money in the Act of August 24, 1912, to pay the descendants of the Lower Chinook, Willapa, Kwalioqua and Wahkiakum, the Congress confirmed that it has extinguished all aboriginal land title of those Indians. The plaintiff tribes do not hold or possess aboriginal land title of the Lower Chinook, Wheelpa Chinook, Willapa (Kwaligua), Wahkiakum Chinook, because those rights were taken and the extinguishment was later confirmed by payment under the Act of August 24, 1912.

20. By appropriating payment in the Act of August 24, 1912 to pay to the descendents of the signers of the unratified Dart treaties with the Lower Band of Chinook and the Wheelpa Band of Chinook, Congress confirmed that it had taken all lands that would have been ceded by the treaties and had extinguished all aboriginal title.

74. The Executive Order creating the Chehalis Reservation must also be viewed in the context of the acculturation policy that pervaded the United States Indian Policy at the time. The United States intended to "civilize" Indians by teaching them cultivation and ways of non-Indian society. Although fishing is not inconsistent with farming or joining non-Indian society, the establishment of a reservation for farming or eventual allotment to individual Indians does not create or reserve by implication off-reservation fishing rights.

In all other respects, the court concurs with the Report and Recommendation and the Proposed Findings of Fact and Conclusions of Law and adopts them as its own.

ACCORDINGLY, IT IS ORDERED that the court adopts the Report and Recommendation filed on October 3, 1991.

IT IS FURTHER ORDERED that the Proposed Findings of Fact and Conclusions of Law lodged on October 3, 1991, as modified by this order, are to be filed by the Clerk of the Court as the court's Findings of Fact and Conclusions of Law.

IT IS FURTHER ORDERED that this matter is remanded to Magistrate John Weinberg for further proceedings as set forth in the Report and Recommendation.

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF MODERATE LIVING AND DENYING APPLICATION FOR PROTECTIVE ORDER

Subproceeding No. 89–3

(April 6, 1993)

EDWARD RAFEEDIE, District Judge.

**TO ALL COUNSEL OF RECORD:**

The Court has read and considered plaintiff Indian Tribes' motion for partial summary judgment which seeks to dismiss the defendants' affirmative defenses relating to moderate living. The Court has also considered the application for a protective order under Fed.R.Civ.P. 26(c) barring all discovery relating to that issue.

The Court concludes that the motion for partial summary judgment should be Denied for the following reasons:

1) The Court finds that the issue of moderate living is relevant and within the scope of this subproceeding, assuming that the treaties at issue provide for Tribal rights to harvest shellfish. The Court will promptly determine whether the treaties grant Tribal rights to harvest shellfish. In so concluding, the Court has considered the following:

The concept of a "moderate living" limitation on a Tribal treaty right to fish is derived from the Supreme Court's decision in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,*

443 U.S. 658, 99 S.Ct. 3055, 3074–75, 61 L.Ed.2d 823 (1979), where the Court reviewed a determination of the existence and allocation of an Indian right to harvest anadromous fish in the state of Washington. In discussing moderate living, the Court stated:

"[T]he central principle here must be that Indian treaty rights to a natural resource that once was thoroughly and exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a livelihood—that is to say, a moderate living. Accordingly, while the maximum possible allocation to the Indians is fixed at 50%, the minimum is not; the latter will, upon proper submissions to the District Court, be modified in response to changing circumstances. If, for example, a tribe should dwindle to just a few members, or if it should find other sources of support that lead it to abandon its fisheries, a 45% or 50% allocation of an entire run that passes through its customary fishing grounds would be manifestly inappropriate because the livelihood of the tribe under those circumstances could not reasonably require an allotment of a large number of fish."

Based on a reading of this case and other decisions which have examined moderate living, it does not appear to the Court that moderate living considerations would, as defendants have implied, obviate a determination of the Tribes' shellfishing rights under the treaties. See e.g. *U.S. v. State of Washington,* 774 F.2d 1470, 1475 (9th Cir.1985) and *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin,* 686 F.Supp. 226 (W.D.Wis.1988). Instead, these cases demonstrate that the Court must first determine general treaty fishing rights, then consider how moderate living considerations, if applicable, affect allocation amounts based on the factors suggested by the Supreme Court as well as the specific circumstances of each case.

■■ 3) As a result, the Court finds that this motion is more appropriately deemed a motion to bifurcate the issue of moderate living from this subproceeding and a request of the Court to defer resolution until a later date. The Court concludes that moderate living considerations are relevant in this subproceeding and Denies the Tribes' motion for summary judgment on the moderate living issues. The parties shall be prepared to proceed with their respective evidence and positions on the moderate living issue.

4) The Court has also reviewed the interrogatories propounded upon the Tribes by the defendants. The Court concludes that the following types of questions are irrelevant to this subproceeding:

i) Individual tribal members income from child support

ii) Individual tribal members alimony or spousal maintenance income

iii) Individual tribal members public assistance benefits

iv) Individual tribal members retirement income

v) Individual tribal members disability compensation

vi) Individual tribal members grants, contracts and other transfer payments

Except for the foregoing, all other interrogatories shall be answered not later than May 1, 1993.

5) The Court orders that this subproceeding will proceed in the following manner:

i) First, a determination of whether, under the treaties, the Tribes have an entitlement to shellfish, and if so, what types and species the Tribes are entitled to. A motion is pending on this issue.

ii) Second, a determination of what allocation the Tribes are entitled to under the treaties.

iii) Third, a determination of the "usual and accustomed grounds and stations" where the Tribes have the right of taking shellfish.

The Court will hear evidence on moderate living, environmental degradation and other sub-issues as they arise when the posture of the case indicates that a resolution of these issues would be appropriate. The parties shall be prepared to offer such evidence when requested to do so by the Court.

6) The Court presently believes that a determination of these issues necessarily overlap and interrelate to such a degree that procedurally and practically, this subproceeding should not be bifurcated. The Court believes that all of the above determinations, including shellfish allocation, can be resolved in this subproceeding without the need for bifurcation. Procedurally, bifurcation would serve only to further delay this already long-pending subproceeding.

7) Consequently, to assist the Court in administering this litigation efficiently, the Court also Orders the following:

Assuming that the Court determines that the treaties at issue provide the tribes with shellfishing rights,

i) Each Tribe shall not later than May 1, 1993, file and serve a statement in writing setting forth the following:

1) The specific locations of the usual and accustomed grounds and stations where it contends a right of taking shellfish exists;

2) The species of shellfish claimed to be encompassed by the treaties; and

3) The evidence upon which it will rely to establish the usual and accustomed grounds and stations where it contends a right of taking shellfish exists.

This evidence and the identified locations and species shall be stated with reasonable specificity. The statements will not be binding, will not waive claims or defenses and may not be offered in evidence against a party in a later proceeding. This evidence is sought by the Court solely to assist the Court in resolving this subproceeding in an efficient and expeditious manner.

IT IS SO ORDERED.

The Clerk of the Court is directed to send copies of this Order to all counsel of record and others entitled to notice, via facsimile, immediately.

ORDER DISMISSING WITHOUT PREJUDICE PHASE II AND CERTAIN SUBPROCEEDINGS IN PHASE I

(June 23, 1993)

BARBARA J. ROTHSTEIN, Chief Judge.

HAVING reviewed the responses of the parties to the interrogatories propounded by the court on February 10, 1993, the court's proposed "Sunset Order," and an earlier draft version of this order, and having held a status conference on Thursday, June 10, 1993, the court hereby finds and rules as follows:

1. Phase II. The United States Court of Appeals for the Ninth Circuit addressed Phase II of this case in *United States v. Washington*, 759 F.2d 1353 (9th Cir.1983). (en banc) The Ninth circuit affirmed this court's determination as to hatchery fish, but reversed the declaratory judgment entered by this court that the State had a duty to refrain from degrading or authorizing the degradation of the fish habitat to an improper degree. The Ninth Circuit

concluded that this issue was not appropriate for resolution by declaratory judgment, and added:

The legal standards that will govern the State's precise obligations and duties under the treaty with respect to the myriad State actions that may affect the environment of the treaty area will depend for their definition and articulation upon concrete facts which underlie a dispute in a particular case.

759 F.2d at 1357. In the ten years since the Court of Appeals decision in 1983, there has been little or no activity by any party in Phase II of this case.

In light of the determination by the Ninth Circuit, and the failure to prosecute for a decade, Phase II is DISMISSED without prejudice to the right of any party to raise the issue in any sub-proceeding in which that party alleges "concrete facts which underlie a dispute in a particular case."

2. Sub–Proceedings 80–1, 80–2, 83–7, 87–5, and 92–2. It appears that these five subproceedings have been concluded and require no further action by the court. Each of these sub-proceedings is therefore DISMISSED without prejudice.

3. "Moderate Living". The State of Washington filed a "Request for Determination Moderate Living" on June 20, 1980. The Request did not receive a subproceeding designation because it was filed before that numbering system began. The State has not pursued the Request in the 13 years since it was filed. It is therefore DISMISSED without prejudice. To the extent "moderate living" has been raised as an issue in other active subproceedings, it may be resolved in those subproceedings.

4. Active Subproceedings. The Court deems only the following subproceedings to be active and pending: 83–3, 83–4, 83–5, 86–2, 86–5, 86–7, 88–1, 89–2, 89–3, 90–1, 91–1, and 92–1. Sub-proceeding 89–3 is pending before Judge Rafeedie. All other active subproceedings are pending before Chief Judge Rothstein.

ORDER RE: CHEHALIS INDIAN
RESERVATION BOUNDARIES

Subproceeding No. 83–3; No. 83–117T(C)

(July 2, 1993)

BARBARA J. ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on objections filed by the Confederated Tribes of the Chehalis Indian Reservation ("Confederated Tribes") to a Report and Recommendation issued by Magistrate Judge John L. Weinberg on February 23, 1993 concerning the boundaries of the Chehalis Indian Reservation. Having reviewed the Report and Recommendation together with all documents filed in support and in opposition, and being familiar with the record in this case, the court finds and rules as follows:

I. INTRODUCTION

In this subproceeding of *United States v. State of Washington,* No. 9213, plaintiff Confederated Tribes requests, among other things, a declaratory judgment that plaintiff has the right to fish upon its reservation without interference from the State of Washington or state fisheries and game agencies. This request has resulted in a controversy over where the boundaries of the Chehalis Indian Reservation lie. The Confederated Tribes insist that the boundaries remain where they were drawn by order of the Secretary of Interior in 1864 when the reservation was created, while the State of Washington argues that the reservation was diminished to a small remnant of its former size by an

executive order issued in 1886.[1] In his Report and Recommendation, Judge Weinberg adopted the State of Washington's position. For the following reasons, the court declines to adopt Judge Weinberg's Report and Recommendation, and finds that the Chehalis Indian Reservation boundaries were not diminished by executive order in 1886, but remain as originally established in 1864.

## II. LEGAL ANALYSIS

### A. Standard of Review

 Once a reservation is established, there is a strong presumption that it remains intact. *DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). Diminishment is not lightly inferred and will be found only where there is a clearly evinced congressional or executive intent to accomplish that end. *Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Any ambiguities are resolved in favor of undiminished reservation status. *Solem,* 465 U.S. at 472, 104 S.Ct. 1161; *DeCoteau,* 420 U.S. at 444, 95 S.Ct. 1082.

The clearest case for finding diminishment is one where the language of the legislation or order at issue contains explicit terms of cession by the Indians, the government unconditionally promises to pay a fixed sum in compensation for the ceded lands, and the tribe ratifies the agreement. *See, e.g., DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). Even when there was no ratification or promise to pay a sum certain, diminishment has been found where the statutory language and events surrounding the passage of the legislation show a clear intent to diminish the boundaries, and the government promises to turn over the proceeds of sale of the opened lands to the Indians as it is received. See, e.g., *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

But legislation simply opening up lands within an Indian reservation for settlement and purchase under homestead laws has not been deemed sufficient to diminish the reservation in the absence of explicit evidence of intent to do so. *Solem v. Bartlett,* 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984); *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Confederated Salish & Kootenai Tribes v. Namen,* 665 F.2d 951, 954–60 (9th Cir.1982); *Colorado River Indian Tribes v. Town of Parker,* 705 F.Supp. 473 (D.Ariz.1989). Standing alone, even statutory language stating that an Indian tribe cedes, surrenders, grants and conveys all claim, right, title and interest in reservation lands has been held not to evince a clear congressional intent to disestablish the reservation. *United States v. Grey Bear,* 828 F.2d 1286, 1289–91 (8th Cir. 1987).

### B. Relevant Factors for Review

The Supreme Court has pointed to three factors which a court must consider to determine congressional or executive intent: (1) the language of the statute or order; (2) the circumstances surrounding the passage of the statute or issuance of the order; and (3) subsequent treatment of the land. *Solem,* 465 U.S. at 470–72, 104 S.Ct. 1161; *Mattz v. Arnett,* 412 U.S. at 505, 93 S.Ct. 2245. This court will consider each factor in turn.

---

**1.** According to the State of Washington, the size of the reservation was further reduced by two other executive orders issued in 1908 and 1909.

### 1. Language of executive order

■ The executive order of October 1, 1886 states without further explanation that a tract of land comprising the better part of the Chehalis Indian Reservation "be, and the same is hereby, restored to the public domain." The order also provides that a much smaller portion of the Chehalis Indian Reservation "be, and the same is hereby, withdrawn from sale or other disposition, and set apart for the use and occupation of the Chehalis Indians."

Judged solely on its face, the language of the executive order appears to indicate an executive intent to diminish the Chehalis Indian Reservation. Compare *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 354, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), which held that the size of the Colville Indian Reservation was diminished by a congressional act stating that about one-half of the original reservation should be "vacated and restored to the public domain...."

### 2. Circumstances surrounding issuance of order

However, an examination of the circumstances surrounding the 1886 order puts the matter in a very different light. They reveal that the goal was not diminishment of the reservation; returning the reservation lands to the public domain was merely a necessary step to achieving the goal of allotting reservation lands to individual Indian families.

The Chehalis Indian Reservation was originally established, not by treaty, but by order of Secretary of Interior J.P. Usher on July 8, 1864. Over the next two decades, the Commissioner of Indian Affairs ("CIA") as well as Indian agents in charge of supervising the reservation became increasingly interested in allotting reservation lands to individual Indians, and increasingly frustrated by the legal barriers to doing so.

In his report of August 21, 1884 to the CIA, Indian Agent Edwin Eells described the problem: "Not being a treaty reservation, there is no authority of law for granting these Indians patents for their allotments. Consequently, nothing has been done in this way for them during the past year." (Ex. SH–CH–M–387) Another report by Eells dated August 20, 1885 (Ex. SH–CH–M–391) expands on his prior explanation and suggests a solution:

> The Chehalis Indians live on a reservation situated on the Chehalis River, about 25 miles inland. This reservation was set aside by executive order and is not a treaty reservation. As a consequence, the Government is not under any treaty obligations to give patents to the Indians living thereon. The lands have been allotted to them in severalty, and they have small farms, but there is no way for them to get patents as the other Indians can. During the last session a bill was introduced into Congress authorizing the President to give them patents for their homes, but it failed to pass and probably always will. For this reason I have suggested to the Department that the executive order be so changed that the Indians residing thereon be allowed to take the lands they occupy under the Indian homestead laws. If this could be done they would then be secured in the quiet and peaceable possession of their homes.

Agent Eells' solution was adopted. On October 1, 1886, President Grover Cleveland signed an executive order restoring most of the original Chehalis Indian Reservation to the public domain. Contemporaneous correspondence relating to this order includes a letter from CIA Atkins to the Secretary of Interior dated September 25, 1886, which confirms that Agent Eells' desire to get around the legal problems

hindering the allotment process was the inspiration for the executive order. (Ex. SH–CH–M–321) The CIA sets forth the history of the creation of the Chehalis Reservation. He then says that in a letter dated April 28, 1885, Agent Eells suggested that an executive order should be issued allowing the Chehalis Indians to enter their lands at the Olympia land office under the homestead laws so that they could acquire title. According to Atkins, Eells was informed that there was no authority for this course of action, but that Eells could allot the lands to the Indians in accordance with an allotment bill, and that if the bill failed to pass, the lands could be restored to the public domain and then entered by the Indian occupants under the homestead laws. The letter goes on to say that on January 2, 1886, Eells furnished schedules of allotments made, which included all of the reservation lands except for 471 acres reserved for a school farm, and expressed hope that title could be given to the Indians as soon as possible. Atkins' letter indicates that "[t]hese Indians are anxious to receive titles for their lands, more especially as all the other Indians belonging to the Nisqually Agency have received patents. This desire has existed for some years, and is a natural one which ought to be granted if possible." The letter also reflects the CIA's belief that although the reservation was established by action of the Department of Interior alone, "the restoration should be made by Executive Order." CIA Atkins accordingly enclosed a draft of an "order restoring the lands and setting apart 471 acres for the use of the Indians, (for school purposes)," and recommended that it be sent to the president for signature,

Ex. SH–CH–M–323 is a copy of a handwritten Department of Interior memo dated October 4, 1886 referring to an executive order "restoring certain described lands, heretofore known as Chehalis rs. in Wash. Ter. to the public domain." Ex. SH–CH–M–324 is a copy of a letter from an Assistant Secretary in the Department of the Interior to the CIA also dated October 4, 1886, which states that enclosed is an executive order "restoring the lands therein described, heretofore known as the Chehalis Indian reservation in Washington Territory, to the public domain, and reserving and setting aside for the use and occupation of the Chehalis Indians" a small portion of land.

Other evidence in the record concerning the intent underlying the executive order includes the testimony of two experts, ethnohistorian Dr. Barbara Lane and sociocultural anthropologist Dr. Nile Thompson. After reviewing the history of the establishment of the Chehalis Indian Reservation and the circumstances surrounding the issuance of the 1886 executive order (Statement of Dr. Barbara Lane as Direct Testimony on Behalf of Chehalis Tribe, pp. 32–38 and 42–44), Dr. Lane concluded at p. 44:

One of the purposes of the 1864 Executive Order was to secure to the Chehalis Indians lands from which they could not be evicted by encroaching settlement. The Executive Orders of 1886, 1908, and 1909 were issued in order to secure by trust patent Indian family holdings within the reservation boundaries. I have seen nothing in the documentary record to suggest any intent on the part of the United States to terminate or diminish the Chehalis Reservation.

Dr. Nile Thompson, who has done extensive field work among the Indians of Western Washington, testified about the settlement by various Indian bands of the lands which became the Chehalis Indian Reservation and the reasons for the selection of

that land to be included in the reservation. He too concludes:

> There is no significant evidence in the historical record that the Executive Order of 1886 was intended to change the boundaries of the Chehalis Reservation. The view that the Executive Order of 1886 was an allotment scheme is supported not only by reference to the process as an allotment by researchers but by references by the Bureau of Indian Affairs itself that call the plan an Allotment Schedule and the Chehalis recipients allottees.

Declaration of Nile Thompson as Direct Testimony, p. 19.

The State of Washington relies on the testimony of historian Alan Newell, who testified that the 1886 order returned reservation lands to the public domain and that they were never returned to reservation status. (Newell Transcript, pp. 875–78) However, on cross-examination, Mr. Newell did acknowledge that "[t]he purpose of the executive order was to allow Indians to take allotments ... through the mechanism of the Indian homestead act." (Newell Transcript, p. 893)

### 3. Subsequent treatment of land

A review of the subsequent treatment of the land in question since the signing of the 1886 order reveals conflicting evidence on whether the boundaries changed. In a chart contained in the 1887 Annual Report of the Commissioner of Indian Affairs, the Chehalis Indian Reservation is listed as including 480 acres. Ex. QN–M–85, p. 378. In his report to the CIA of September 2, 1890 (Ex. QN–M–88), Indian Agent Edwin Eells stated with regard to the Chehalis tribe, that "[w]hat is there called a reservation, is merely a collection of Indian homestead settlers grouped together on contiguous places."

But reports after 1890 from school superintendents on the reservation seem to assume the existence of reservation boundaries as drawn in the original 1864 order. For example, on June 30, 1895, the superintendent of the Chehalis School reported that "[d]uring the past spring, with the aid of the Indians, we cut a road ... connecting the reservation at the Chehalis–Thurston county line with our railroad station." (Ex. SH–CH–M–375) Superintendent Frank Terry's report of 1901 described the Chehalis Reservation as "a long, narrow strip of land, and the school is situated near one end of the reservation and is therefore inaccessible to the pupils living upon the other end. (Ex. SH–CH–M–383) Likewise, the superintendent's report dated August 16, 1906 (Ex. SH–CH–M–384) describes the Chehalis Reservation as follows:

> [It] is located near Oakville, Chehalis County, and these Indians are gradually improving their allotments and are generally prosperous. The low land is quite fertile and the higher land is used for winter grazing. The day school is well attended and has been quite successful. New roads have been built and old ones repaired, and we now have an excellent road thru [sic] the reservation to Oakville.

Exs. SH–CH–M–377 and –378 are copies of farming and grazing leases from 1911 through 1919 which state that the lands being leased are allotments on the Chehalis Indian Reservation. Ex. SH–CH–M–379 contains a letter of August 11, 1916 from the Supervisor of Forests to the CIA "[i]n connection with the sale of cottonwood timber on the Chehalis Indian Reservation and a letter dated September 15, 1916 from the Superintendent to the would-be purchaser of the timber referring to the CIA's "declining to approve your contract for the purchase of cottonwood timber on the Chehalis Reservation." The

timber in question was on several allotments.

Coming down to the present era, the record contains several exhibits leading to conflicting conclusions. Ex. SH–CH–M–496 is a copy of an agreement dated October 9, 1952 between the Chehalis Indian Tribal Council and the Washington Department of Fisheries concerning regulations for the management of the Chehalis River salmon runs within the boundaries of the Chehalis Indian Reservation. This agreement recognizes the existence of an on-reservation fishery stretching to the original reservation boundaries.

Regarding the subject of on-reservation fisheries, the Confederated Tribes also present the testimony of Gene Deschamps, the tribal fishery's biologist for the past six and one-half years. Before then, he was employed for thirty years by the State Department of Fisheries as a biologist for the State of Washington. His current responsibilities include overall management of the tribal fisheries and negotiations with the State of Washington concerning seasons and catches. Mr. Deschamps testified that "[d]uring [his] entire time with the State of Washington, it was clear in both action and words that the State of Washington recognized the on-reservation fishery of the Confederated Tribes of the Chehalis Indian Reservation." (Declaration of Gene Deschamps as Direct Testimony, p. 3)

The State of Washington in turn stresses the contents of a memorandum dated March 13, 1964 from J.L. Vaninetti, Agency Realty Officer to G.M. Felshaw, Superintendent, on the history of the Chehalis Reservation. (Ex, SH–CH–M–337) Vaninetti reviews the creation of the reservation and the issuance of the executive orders restoring lands to the public domain. He concludes with the statement that "[t]he present Chehalis Reservation area consists of 346.7 acres, more or less."

On the other hand, the Confederated Tribes point to the Constitution and By-laws of the Confederated Tribes of the Chehalis Reservation (Ex. 5H–CH–M–243), which state that their jurisdiction "shall extend to the territory within the present boundaries of the Chehalis Indian Reservation as established by Executive Order of July 8, 1864, ..." The Constitution and Bylaws were approved by Deputy Assistant Secretary of the Interior W.L. Rogers on July 11, 1973.

Finally, Ex. SH–CH–M–322 is a report entitled "The Chehalis People" by the Confederated Tribes of the Chehalis Reservation published in 1989 which assumes that the reservation includes all of the lands originally allocated to it under the order of July 8, 1864. The report describes the reservation as follows:

> The original land area of the reservation totalled 4,214.83 acres. In 1967, tribal lands totalled 21 acres and 1,709.58 acres were individually owned land in trust or restricted status. The remaining 2,484.25 acres is alienated land, which means that the ownership has been transferred to non-Indians. The trust lands are largely held by the descendants of the original allottees of the Chehalis Reservation.

## III. CONCLUSION

Having carefully considered the language of the order and the historical record, the court finds that there is no "substantial and compelling evidence of a[n executive] intention to diminish Indian lands" as required under Supreme Court precedent. *Solem,* 465 U.S. at 472, 104 S.Ct. 1161. It is true that, viewed alone apart from its historical context, the language of the executive order tends to sup-

port the conclusion that diminishment was intended.[2]

But upon review of the events surrounding the issuance of the executive order, the court is convinced that there was no intent to diminish the size of the Chehalis Indian Reservation. Returning reservation lands to the public domain was only a means of accomplishing the actual purpose of allotting reservation lands to individual Indians. Based on the record before it, the court is persuaded that no Chehalis reservation lands would have been returned to the public domain in 1886 if the allotment process could have been effected without changing the reserved status of those lands.[3] Thus, the requisite specific intent to diminish the reservation was absent.

Finally, the subsequent treatment of the reservation is for the most part not consistent with the conclusion that it suffered significant diminishment in 1886. Only those exhibits narrowly based on the language of the 1886 executive order conclude that the reservation was diminished. See, e.g., Exs. SH–CH–M–323, SH–CH–M–324, EX. QN–M–87 at p. 378, SH–CH–M–337. The exhibits reflecting the pragmatic treatment of the reservation lands all support the premise that people considered the reservation to encompass all lands within the original 1864 boundaries. This includes not only the Confederated Tribes, but the federal government and the State of Washington. In particular, the State of Washington has consistently recognized an on-reservation fishery as defined by the Confederated Tribes to include all lands within the 1864 reservation boundaries.

Thus, the court concludes that the boundaries of the Chehalis Indian Reser-

2. However, the United States Supreme Court has cautioned that language about diminishment and the public domain should not necessarily be taken literally. In *Solem v. Bartlett*, 465 U.S. 463, 474–75, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), the Court found that the Act in question only opened the Cheyenne River Sioux reservation to settlement, but did not diminish it. In reaching this conclusion, the Court had to contend with some language in the Act referring to unopened territories as "within the respective reservations thus diminished." The Act also permitted tribal members to harvest timber on certain parts of the opened lands for "only so long as the lands remain part of the public domain." The Court held that these isolated phrases were not dispositive; when balanced against the other evidence leading to the contrary result, they could not "carry the burden of establishing an express congressional purpose to diminish." *Id.* at 475, 104 S.Ct. 1161. In a footnote to this discussion, the Court also noted that there is considerable doubt about what Congress meant in using those phrases: in 1908, "diminished" was not a term of art in Indian law; and "even without diminishment, unallotted opened lands could be conceived of as being in the 'public domain' inasmuch as they were available for settlement." *Id.* at 475 n. 17, 104 S.Ct. 1161.

3. As discussed above, allotment could have occurred without returning reservation lands to the public domain if the Chehalis Indian Reservation had been established by treaty. The court notes that, according to the testimony of Dr. Barbara Lane, the Superintendent of Indian Affairs requested permission in July of 1862 to enter into a treaty with the Chehalis Indians, who were in turn anxious to secure reservation status for at least a portion of the lands on which they had traditionally lived. But instead of signing a treaty as requested by both the Superintendent and the Chehalis Indians, the federal government instead proceeded by executive order to establish the Chehalis Indian Reservation in 1864. (Statement of Dr. Barbara Lane as Direct Testimony on Behalf of Chehalis Tribe, p. 38) Thus, the fact that the reservation was not established by treaty appears to be a historical accident contradictory to the wishes of the Chehalis Indians. Although the court does not rest its decision on this point, it seems more than a little unfair to conclude that the Chehalis Indian Reservation was diminished as the result of an order necessitated by the federal government's own decision to ignore the Indians' original request for treaty status.

vation remain where they were drawn by order of the Secretary of Interior in 1864 and were not diminished by the executive order of 1886.[4]

## ORDER MODIFYING PARAGRAPH 25 OF PERMANENT INJUNCTION

(Aug. 24, 1993)

BARBARA J. ROTHSTEIN, Chief Judge.

Paragraph 25 of the court's March 22, 1974, permanent injunction (384 F.Supp. at 419) is modified to provide as follows:

25. (a) The parties or any of them may invoke the continuing jurisdiction of this court in order to determine:

(1) Whether or not the actions intended or effected by any party (including the party seeking a determination) are in conformity with Final Decision # I or this injunction;

(2) Whether a proposed state regulation is reasonable and necessary for conservation;

(3) Whether a tribe is entitled to exercise powers of self-regulation;

(4) Disputes concerning the subject matter of this case which the parties have been unable to resolve among themselves;

(5) Claims to returns of seized or damaged fishing gear or its value, as provided for in this injunction;

(6) The location of any of a tribe's usual and accustomed fishing grounds not specifically determined by Final Decision # I; and

(7) Such other matters as the court may deem appropriate.

(b) To invoke this court's continuing jurisdiction, the party seeking relief shall initiate a subproceeding in this action by filing a request for determination. Subproceedings will be conducted in accordance with the following procedures:

(1) Before a request for determination is filed (except for an emergency matter, addressed below), the party seeking relief ("requesting party") shall meet and confer with all parties that may be directly affected by the request ("affected party") and attempt to negotiate a settlement of the matter in issue. Counsel for the requesting party shall be responsible for scheduling the initial meeting and shall notify all parties to this action of the time and place of the meeting. All affected parties shall cooperate by participating in such a meeting when requested to do so upon reasonable notice from the requesting party. Policy representatives of and counsel for the participating parties, shall be present at the meeting. In addition to other matters the parties may wish to address, the parties shall discuss at the meeting (A) the basis for the relief sought by the requesting party; (B) the possibility of settlement; (C) whether the matter is properly one for the Fisheries Advisory Board (FAB); (D) identification of technical issues relevant to the matter in controversy, areas of agreement and disagreement on such issues, and methods for developing an agreed technical basis to narrow or resolve the controversy; (E) whether

---

4. The State of Washington also mentions in passing executive orders issued in 1908 and 1909 which allegedly further diminished the Chehalis Indian Reservation by returning reservation lands to the public domain. In the absence of any further information about the reasons for these orders, the court reaches the same conclusion that they did not result in any diminishment of the reservation.

independent extra-judicial actions (e.g., regulatory action by a government agency) may remove the need for or warrant deferral of an adjudication; (F) whether earlier rulings of the court may have addressed or resolved the matter in issue in whole or in part; and (G) whether the parties can agree to mediation or arbitration of the issues before or in lieu of litigation. The parties shall continue to meet and negotiate as long as there appears to them to be a substantial possibility of settlement. If the negotiations fail, the parties may proceed to mediation in accordance with subparagraph (b)(2) or, absent mediation, the requesting party may file its request for determination. Except as provided in subparagraph (b)(7), no request for determination shall be filed sooner than 15 days after the conclusion of negotiations.

(2) If the requesting party and the affected parties are unsuccessful in negotiating a solution to the issue in accordance with subparagraph (b)(1), the requesting party or any affected party may demand mediation within 12 days after the conclusion of the unsuccessful negotiations. Notice of demand for mediation shall be served upon all parties to this action. The requesting party and all affected parties shall participate in the mediation, which shall be conducted pursuant to local Civil Rule 39.1(c)(3)(7). The requesting party or an affected party may move the court for an order (A) compelling mediation under this subparagraph or (B) waiving mediation under this subparagraph or relieving the. moving party from any obligation to participate in a mediation. Unless agreed or ordered otherwise, the parties participating in the mediation will share the mediator's fees and related expenses on a pro rata basis.

(3) After complying with the foregoing requirements (including Rule 39.1 mediation if applicable), a party seeking relief shall file with the clerk of this court and serve upon all other parties (through their counsel of record, if any) a "request for determination," not to exceed twelve pages in length. The request for determination shall contain a short and plain statement setting forth the factual and legal basis of the claim for relief or other matter presented to the court, and a statement of the relief sought by the requesting party. The request shall not contain legal argument or be accompanied by submission of evidence. Counsel for the requesting party shall file with the request for determination a declaration attesting to that party's compliance with the requirements of subparagraph (b)(1).

(4) A party wishing to file a response to a request for determination shall do so no later than sixty days after the filing date of the request. A party responding to a request may assert a counter-request for determination if such counter-request relates directly to the subject matter of the request for determination. Cross-requests between respondents are discouraged and shall be permitted only with prior permission of the court. Counsel for parties participating in a subproceeding shall submit a separate notice of appearance with the party's request for determination or before or with the party's response.

(5) Motion practice, discovery and case scheduling in subproceedings initiated under this paragraph 25 shall be conducted in accordance with the Federal Rules of Civil Procedure and the general and civil rules of this

court. Each subproceeding shall be subject to local Civil Rule 39.1. The court and the parties may employ the procedures provided by Rule 39.1 to the same extent as if the subproceeding were a separate action, but where the parties have participated in a pre-filing mediation pursuant to subparagraph (b)(2), the court will not require a second mediation in the subproceeding except upon agreement of the requesting party and a majority of the adverse respondents.

(6) No later than ninety days after the initiation of a subproceeding by a request for determination, any party seeking referral of the matter to a special master or United States Magistrate Judge shall file a motion seeking such referral and specifying whether the party seeks appointment of a special master or magistrate judge and the nature of the functions the party proposes to have delegated to that officer. Referrals to special masters or magistrate judges shall be made on a case by case basis, in the discretion of the court, pursuant to Fed.R.Civ.P. 53 or 28 U.S.C. § 636(b). To facilitate appointment of special masters and mediators, the court will maintain a register of persons who are qualified and available to serve in such capacities in this action. The parties may nominate persons to be named on the register, and the court will consider the nomination on the basis of the candidate's qualifications and the extent of support for the nomination among the parties. Parties may propose persons not named on the register for appointment in individual subproceedings. The parties shall proffer their initial nominations to the court by October 1, 1993.

(7) Any party may seek determination of an emergency matter subject to satisfaction of the following conditions: (A) the party shall initiate a subproceeding (if not previously initiated) by filing and serving on all parties a request for determination; (B) the requesting party shall file with the request and serve on all parties a motion for temporary restraining order or preliminary injunction, which shall comply with and be decided in accordance with the civil rules and legal standards generally governing such motions; and (C) the requesting party shall file and serve a declaration of counsel stating that the party has made a <u>bona fide</u> effort to resolve the emergency issue with the affected parties and has failed to do so; that actual notice of the motion has been provided to each party that is the subject of the motion; and that the matter in issue constitutes an emergency in the judgment of the party and its attorney. Motions for temporary restraining orders shall be filed only in circumstances where irreparable harm is likely to occur before a hearing on a motion for preliminary injunction can be scheduled.

(8) Upon receipt of a motion for temporary restraining order or preliminary injunction complying with subparagraph (b)(7), the court will advise the parties of the time and date for hearing, whether further briefing will be required before hearing, and whether oral testimony will be permitted or required at the hearing. Unless the ruling on the motion for temporary restraining order or preliminary injunction finally disposes of the request for determination in its entirety, the request shall be decided in accordance with this paragraph 25 in the ordinary course of the court's business.

(9) Except as specifically provided in this paragraph, this injunction shall not alter or deprive the parties of any right to bring motions or other matters before this Court as provided in the Federal Rules of Civil Procedure.

## ORDER GRANTING PLAINTIFF TRIBES' SUMMARY JUDGMENT MOTION THAT SHELLFISH ARE FISH

Subproceeding No. 89–3

(Sept. 2, 1993)

EDWARD RAFEEDIE, District Judge.

**TO ALL COUNSEL OF RECORD:**

The Court has read and considered the cross motion for summary judgment brought by the plaintiff seeking a determination that shellfish are fish and the cross motion for summary judgment brought by the defendant seeking dismissal. The Court views the issue involved in both motions as whether shellfish are the same as "fish" under the Stevens Treaties of 1854. Specifically, the Tribes and the State of Washington disagree as to whether shellfish are included in the "right of taking fish" and have filed these cross motions for summary judgment on the issue of whether shellfish are the same as "fish" under the Stevens treaties. The Court has considered both motions in this order and finds that shellfish are encompassed within the word "fish" under the treaties.[1]

This case involves an interpretation of the Stevens Treaties and the scope and nature of Tribal shell-fishing rights there-under. The Tribes have claimed a right to harvest shellfish outside of their reservations as allegedly provided for in the treaty clause:

> "The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens."

Issac I. Stevens[2] and George Gibbs were the primary negotiators of the treaties for the United States. The treaties were written in English and translated for the Indians by an interpreter employed by the United States using Chinook jargon. Chinook jargon was not a native Indian language, but consisted of approximately "three hundred words used to convey rudimentary concepts, but not the sophisticated meaning of treaty provisions about which highly learned jurists and scholars differ." *United States v. State of Washington,* 384 F.Supp. 312, 330 (1974) (also referred to as the Boldt decision).

### Standard for Summary Judgment

Fed.R.Civ.P. 56(c) provides that summary judgment will be granted if the moving party can establish that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *British Airways Board v. Boeing Co.,* 585 F.2d 946, 951 (9th Cir. 1978). It is the moving party's burden to

---

**1.** The Court wishes to note at the outset that its resolution of this particular issue is limited solely to whether the treaties provide for Tribal shellfishing rights. This order is not intended to resolve remaining issues such as allocation. This order is limited to the issue of whether shellfish can be regarded as "fish" under the treaties at issue.

**2.** Stevens was the Governor of Washington during the time when the treaties were negotiated.

inform the Court of the basis for its belief there are no genuine issues of material fact and this may be demonstrated by pointing out an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Canons of Treaty Construction

■ According to *United States v. Choctaw Nation,* 179 U.S. 494, 506, 21 S.Ct. 149, 45 L.Ed. 291 (1900), the intentions of the parties to the treaty will control the treaty's interpretation. In determining the intentions, a Court should look to "the words used—the words being interpreted, not literally nor loosely, but according to their ordinary signification. If the words be clear and explicit, leaving no room for doubt what the parties intended, they must be interpreted according to their natural and ordinary significance." *Id.* (emphasis added).

Therefore, under the familiar cannon of statutory construction, the starting point for interpreting a statute (in this case a treaty) is the language of the statute itself and "absent a clearly expressed legislative intention to the contrary, ... [treaty] language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); See also *Sumitomo Shoji America Inc. v. Avagliano,* 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ("Clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent of expectations of its signatories").

■ Special canons of construction are applied to determine the meaning of Indian treaties. Those canons provide that any ambiguities in language must be resolved in favor of the Indians, that the language should not be construed to the prejudice of the Indians, and that technical meanings should be avoided in favor of the understanding of the Indians. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675–676, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 528, 8 L.Ed. 483 (1832); *Winters v. United States,* 207 U.S. 564, 577, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *U.S. v. Winans,* 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

■ Finally, treaties must be "viewed in historical context and given a 'fair appraisal'," in light of how treaty language was understood by the tribal representatives who participated in their negotiation. *Fishing Vessel,* 443 U.S. 658, 675, 99 S.Ct. 3055 (1979); *Tulee v. Washington,* 315 U.S. 681, 684–685, 62 S.Ct. 862, 86 L.Ed. 1115 (1942).

The pertinent language of the treaties at issue can be divided into the following sections:

1) "The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, ..."

2) "together with the privilege of hunting and gathering roots and berries on open and unclaimed lands ..."

3) "Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens."

PLAIN LANGUAGE/READING OF TREATIES

■ Under a plain reading of the treaty language, it appears to the Court that the last phrase, "[p]rovided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens," prohibits the taking of shellfish from staked or culti-

vated beds. Since this appears to be an exception concerning a particular class of shellfish (i.e. shellfish found in a particular location), it logically follows that shellfish were included in the "right of taking fish" referred to in the first sentence. This interpretation is well taken, for if shellfishing rights had not been encompassed within this phrase, the entire third clause, "Provided, however ...", would serve no purpose.

Also, "[I]t is an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). Thus, this treaty should be interpreted and read to give effect to all its provisions and to avoid the conclusion that some words have no meaning. Under this analysis, the Court finds that shellfish are encompassed with the word "fish".

However, even if the Court were to find that the treaty language at issue was ambiguous on the intended meaning of the word "fish"[3], an interpretation that "fish" includes shellfish would still result in light of the policy that any ambiguities in language must be resolved in favor of the Indians, that the language should not be construed to the prejudice of the Indians, and that technical meanings should be avoided in favor of the understanding of the Indians. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675–676, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 528, 8 L.Ed. 483 (1832); *Winters v. United States,* 207 U.S. 564, 577, 28 S.Ct. 207, 52 L.Ed. 340 (1908).

Finally, beyond the plain language of the treaties themselves, prior case law addressing the historical background of the Indian treaty negotiations appear to support a finding that treaty term "fish" includes shellfish. As stated by the Court in *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), the Treaties should not be viewed as grants of rights to the Indians, but as grants of rights from the Indians to the United States. Thus, rights which were already possessed by the Indians and not granted to the United States were reserved by the Indians.

Consequently, the court finds that the treaty language may also be construed to connote that the "[p]rovided, however" clause merely establishes limits an already existing Tribal right to harvest shellfish. In other words, if the Indians did not negotiate shellfishing rights, it is assumed that the Indians intended to reserve their shellfishing rights except for those limitations placed upon shellfishing that were specifically placed in the treaties.

It is also undisputed that the Indians harvested shellfish. In the <u>Boldt</u> decision, *United States v. Washington,* 384 F.Supp. 312 (W.D.Wash.1974), the Court made several statements and findings of fact showing that the Indians specifically relied on fish and shellfish and engaged in extensive shellfishing:

1) "One common cultural characteristic among all these Indians was the almost universal and generally paramount dependence upon the products of an aquat-

---

**3.** See *Romero v. Kitsap County,* 931 F.2d 624, 628 (9th Cir.1991) (Finding that a separate judicial determination was required as to whether the Stevens treaties encompassed shellfishing rights because the treaties themselves do not specifically delineate the Indians' right to take shellfish in such a way that the nature and scope of that right is readily apparent and that treaty rights to shellfish were not clearly established by virtue of the treaty language alone. Such a determination was beyond the scope of the *Romero* proceedings.)

ic economy, especially anadromous fish, to sustain the Indian way of life." Finding of Fact No. 3, *Id.* at 350.

2) "Aboriginal Indian fishing was not limited to any species. They took whatever species were available at the particular season and location." Finding of Fact No. 11, *Id.* at 352.

3) "In the decade immediately preceding the treaties, Indian fishing increased in order to accommodate increased demand for local non-Indian consumption and for export, as well as to provide money for purchase of introduced commodities and to obtain substitute non-Indian goods for native products which were no longer available because of the non-Indian movement into the area. Those involved in negotiating the treaties recognized the contribution that Indian fishermen made to the territorial economy because Indians caught most of the non-Indians' fish for them, plus clams and oysters." *Id.* at 351–52.

4) "[The] major food sources of the Northwest Indians were the wild fish, animal and vegetative resources of the area .... individual families dispersed in various directions to join families from other winter villages in fishing, clam digging, hunting and gathering roots and berries and agricultural pursuits." *Id.* at 350–351.

5) "Prior to the Treaty of Point Elliot, the Lummi, Semiahmoo and Samish Indians had been engaged in the trade in salmon, halibut and shellfish both with other Indians and with non-Indians." Finding of Fact No. 45, *Id.* at 360.

Further evidence of the Indian's shell-fishing activities were noted by the Ninth Circuit in *United States v. Aam*, 887 F.2d 190, 195 (9th Cir.1990):

"At the time of the [Treaty of Point Elliot], the Suquamish Indians harvest-ed shellfish from tidelands over a wide area of Puget Sound. The district court found that such shellfish formed a staple in their diet, although salmon provided most of the tribe's food." [4]

Also, the treaty negotiators, Stevens and Gibbs, noted the importance of shellfish to the Indian economy:

1) Stevens explicitly reported that the Indians "catch most of our fish, supplying not only our people with clams and oyster, but salmon to those who cure and export it." (Letter. from Stevens to the Commissioner of Indian Affairs Manypenny, December 30, 1854).

2) Gibbs spoke of Indians taking a "great variety" of shellfish and that "many of these are dried for winter stores." Tribes of Western Washington and Northwestern Oregon, Department of the Interior, Washington D.C. 1877).

Based on the above analysis, the Court finds that under the treaties, shellfish are included in the right of taking fish. Therefore, the Plaintiff Tribes' Motion for Summary Judgment that shellfish are fish is Granted and the Defendant's Motion for Summary Judgment of Dismissal is Denied.

IT IS SO ORDERED.

The Clerk of the Court is directed to send copies of this Order to all counsel of record and others entitled to notice, via facsimile, immediately.

ORDER ON FIVE MOTIONS
RELATING TO TREATY
HALIBUT FISHING

Subproceeding No. 92–1

(Dec. 29, 1993)

BARBARA J. ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on five pending motions in the above-cap-

---

**4.** The Treaty of Point Elliot is one of the 1854 Stevens Treaties at issue in the present case.

tioned cases, which have been consolidated for the limited purpose of considering these motions. In No. C85–1606, three parties have filed motions for partial summary judgment: the Makah Indian Tribe ("Makah"), the Secretaries of Commerce and State ("federal defendants"), and the State of Oregon. Makah has also filed essentially identical motions for a preliminary injunction in No. C85–1606 and Civil No. 9213, subproceeding 92–1. Having reviewed the submissions of the parties relating to those motions, the Report and Recommendation on Five Motions Relating to Treaty Halibut Fishing submitted by United States Magistrate Judge John L. Weinberg, and relevant other portions of the record in both cases, the court finds, and rules as follows:

## I. FINDINGS AND CONCLUSIONS ADOPTED

The court adopts the findings and conclusions set forth in Magistrate Judge Weinberg's Report and Recommendation regarding the following issues:

(A) judicial confirmation of Makah's treaty right to fish for halibut as determined by the Secretary of Commerce ("the Secretary");

(B) the applicability to halibut of the rule for salmon that a treaty tribe is entitled to take 50% of the harvestable surplus which passes through its usual and accustomed fishing grounds, unless a lesser amount is sufficient to assure a moderate living;

(C) judicial confirmation of the boundaries of Makah's usual and accustomed halibut fishing grounds as determined by the Secretary;

(D) the violation of Makah treaty rights inherent in the Secretary's past procedure for allocating the halibut harvest in Area 2A–1;

(E) declining to consider the issue of directing the Secretary to account for by-catch mortality;

(F) declining to direct the Secretary to consider the option of subregional allocations of the available halibut harvest; and

(G) the lack of any obligation imposed by treaty to attempt to secure for Makah the right to fish for halibut in waters outside the jurisdiction of the United States.

## II. FINDINGS AND CONCLUSIONS NOT ADOPTED OR MODIFIED

The court declines to adopt the findings and conclusions set forth in the Report and Recommendation, and substitutes its own findings and conclusions concerning the following issues:

(A) Judicial confirmation of treaty tribe status and usual and accustomed fishing grounds of four other tribes.

The Secretary previously determined that eleven other tribes in addition to Makah have treaty rights to fish for halibut. See 50 C.F.R. § 301.19(b). Four of those eleven tribes, the Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam and Skokomish Tribes, joined in Makah's request for determination and motions asking this court for judicial confirmation of their treaty tribe status for purposes of halibut fishing.

The State of Washington opposed the four tribes' request for judicial confirmation on the grounds that they did not make a specific enough showing, and that the state of Washington had not had a meaningful opportunity to do discovery or to retain expert witnesses to evaluate the four tribes' claims to treaty fishing rights for halibut.

Having reviewed the pertinent record, the court rejects the State of Washington's argument. It is true that the four tribes

did not file separate motions requesting the relief in question. However, the State of Washington has been on notice of the four tribes' position since April 3, 1992 when they joined with the Makah in requesting judicial confirmation of their treaty tribe status. On April 23, 1992, the State of Washington filed an answer denying the four tribes' entitlement to treaty tribe status.

More than a year elapsed between the time that the four tribes filed their request for determination on April 3, 1992 and their joinder on May 14, 1993 in the Makah's request for judicial confirmation of treaty tribe status. During that time, the State of Washington apparently chose to conduct no discovery regarding the four tribes' request. The court finds that the State of Washington had ample opportunity to engage in discovery, and that the issue of the four tribes' treaty tribe status for purposes of halibut fishing is, therefore, properly before the court for a decision at this time. The court also notes that the State of Washington did set forth arguments and evidence in opposition to the four tribes' request. Thus, the court has had an opportunity to consider the State of Washington's general contentions, if not all of the details which further discovery might provide.

Based on careful consideration of the evidence presented by the four tribes together with the State of Washington's response, the court concludes that the record amply supports the findings of the Secretary that the four tribes have a right protected by the Treaty of Point No Point to fish for halibut in their usual and accustomed fishing grounds. The court further concludes that the boundaries of the four tribes' usual and accustomed halibut fishing grounds are as determined by the Secretary and as set forth at 50 C.F.R. § 301.19(j).

(B) Ruling on Makah motion for summary judgment.

Although Magistrate Judge Weinberg concluded that the federal defendants' past procedure for allocating the halibut harvest in Area 2A–1 violated Makah's treaty rights, he recommended denying without prejudice its motion for summary judgment until the issue of the appropriate remedy was resolved. In keeping with Makah's objection, the court concludes that Makah's motion for summary judgment should be partially granted in the form of declaratory relief stating that federal defendants violated Makah's treaty rights. However, the motion is denied as to the appropriate remedy for the 1989 through 1993 halibut fishing seasons until the moderate living issue is resolved.

(C) Standard for determining fish harvest to be allocated.

Magistrate Judge Weinberg recommended that the court grant the Makah motion for a preliminary injunction as to the 1994 and subsequent halibut fishing seasons. Instead of prescribing the percentage of the total available catch in Area 2A–1 to be allocated to treaty fishers, he recommended that the court direct the Secretary in more general terms to revise his regulatory scheme so that allocations afford treaty and non-treaty fishers the opportunity to take equal quantities of halibut within the treaty tribes' usual and accustomed fishing grounds.

The court adopts Magistrate Judge Weinberg's recommendation with one exception. Having carefully reviewed all of the objections and arguments filed with regard to the applicable standard which the Secretary should be directed to follow in making allocations to treaty and non-treaty fishers, the court concludes that Makah and the other tribes which briefed

the issue are correct. In formulating his allocation decisions, the Secretary must accord treaty fishers the opportunity to take 50% of the harvestable surplus of halibut in their usual and accustomed fishing grounds, and the harvestable surplus must be determined according to the conservation necessity principle. See *United States v. State of Washington,* 774 F.2d 1470, 1476 (9th Cir.1985). See also *United States v. Washington,* 520 F.2d 676, 685–86 and n. 3 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) affirming Judge Boldt's decision in 384 F.Supp. 312 (W.D.Wash.1974), which held that the determination of the number of fish available for harvest must be based solely on resource conservation needs.

Although the federal defendants do not disagree with the standard in principle, they voice concerns about conflicts with the total allowable catch set by the International Pacific Halibut Commission. These concerns are entirely hypothetical at this point and do not detract from the Secretary's general obligation to strive as best he can to observe domestic law and protect treaty rights.

As for the State of Oregon's objection, the court rejects the argument that only state and not federal regulatory agencies are bound by the conservation necessity principle in determining the harvestable surplus of fish to be allocated between treaty and non-treaty fishers. The decision in *United States v. Eberhardt,* 789 F.2d 1354 (9th Cir.1986), is entirely distinguishable. Unlike the situation in this case where the Department of Commerce is regulating the distribution of fish resources between treaty and non-treaty fishers, the agency in *Eberhardt* was acting as a trustee for the treaty tribes in accordance with the express, wishes of the majority of the Indians on the affected reservation.

(D) Description of fishers affected by ruling.

All parties agree that Magistrate Judge Weinberg's references to treaty and non-treaty commercial fishers in his Report and Recommendation should be broadened to include treaty and non-treaty fishers in general, including non-treaty sport fishers as well as subsistence and ceremonial treaty fishers. The court accordingly adopts the more inclusive language.

### III. CONCLUSION

In conclusion, the court GRANTS in part and DENIES in part Makah's motion for partial summary judgment, GRANTS federal defendant's motion for partial summary judgment as to Makah's claims relating to Swiftsure and 40 Mile Banks, GRANTS Makah's motions for preliminary injunction and STRIKES the State of Oregon's motion as moot.

### REPORT AND RECOMMENDATION ON FIVE MOTIONS RELATING TO TREATY HALIBUT FISHING

Subproceeding No. 92–1

(Oct. 1, 1993)

JOHN L. WEINBERG, United States Magistrate Judge.

#### INTRODUCTION

These case's involve the right of the Makah Indian Tribe, and certain other treaty tribes, to fish for halibut.

There are two main areas of dispute: (a) the tribes claim they have not been allocated their fair share of the halibut harvest in the marine waters subject to U.S. jurisdiction; and (b) the Makahs assert they are entitled to relief because their commercial fishers have been denied access to two

productive fishing grounds now within the exclusive economic zone of Canada.

These general areas of dispute present a range of difficult and complex issues, including the following:

(1) Do the tribes have treaty rights to fish for halibut?

(2) If so, are those rights identical to their rights to fish for salmon?

(3) What are the "usual and accustomed fishing grounds" of each tribe for halibut?

(4) Have federal authorities improperly limited the allocations of halibut to the tribes over the past nine years?

(5) Are the tribes entitled to preliminary injunctive relief as to future allocations of halibut?

(6) Did the Treaty with the Makahs assure the tribe that federal authorities would protect the Makahs' right to fish for halibut at the locations known as "Swiftsure" and "40 Mile Banks?"

(7) If so, have the federal defendants violated that obligation?

(8) If so, what is the appropriate remedy?

## PENDING MOTIONS

There are five motions before the court in these two cases. Three are motions for partial summary judgment in C85–1606. Those motions have been filed by the federal defendants, by the Makahs, and by the State of Oregon. Also pending, and closely related to the motions for partial summary judgment, are two identical motions by the Makahs for a preliminary injunction, one filed in each of the two cases.

The court has partially consolidated the two cases for purposes of determining these motions and has referred all five motions to the U.S. Magistrate Judge.

The parties have submitted over. 1,000 pages of briefing on these motions, and a much larger volume of exhibits. They have also presented extensive oral argument on both sets of motions.

This Report and Recommendation sets forth proposed rulings on all five motions.

## PROCEDURAL HISTORY

Case No. C85–1606. The Makahs filed this case in 1985, and it was assigned to the Hon. Walter T. McGovern. Named as defendants were the United States Secretaries of Commerce and of State ("the federal defendants"). The court granted leave to intervene to the States of Washington and Oregon. The complaint raised essentially all the issues summarized above.

Early in the case, the federal defendants moved to dismiss several of the Makahs' claims, asserting that they were not "justiciable" issues because they were within the exclusive domain of the Executive Branch. Judge McGovern granted the motion only as to one claim, holding that challenges to the content of regulations promulgated by the International Pacific Halibut Commission ("IPHC") were not justiciable. He denied the motion in all other respects. (Judge McGovern's order appears at docket no. 169.)

Even if the Makahs have a treaty right to fish for halibut, the other parties assert that the Makahs do not require a full 50% share of the available harvest to provide them the "moderate living" guaranteed by the treaty. Judge McGovern held this was a proper issue in the case, denying a Makah motion for a protective order. But he also bifurcated the issue, ruling that both discovery and trial on this issue would

occur after disposition of the other issues in the case.

Judge McGovern heard oral argument on the three motions for partial summary judgment on February 10, 1992. He denied all three motions ten days later when he dismissed the entire case (docket no. 257). The dismissal was based upon his ruling that the requests for relief were premature. The Makahs were required first to apply in *U.S. v. Washington* for determination of whether they had a treaty right to fish for halibut, and if so, what were their usual and accustomed fishing grounds. But on April 24, 1992, Judge McGovern vacated the portion of his order dismissing the action, and "transferred" the case to *U.S. v. Washington* (docket no. 271). The net effect was that the three motions for partial summary judgment were all revived.

Also pending in Case No. C85–1606 is the Makahs' motion for preliminary injunction, which is identical to their motion filed in sub-proceeding no. 92–1.

Case no. 9213, sub-proceeding no. 92–1. In apparent response to Judge McGovern's ruling in C85–1606, the Makahs began this sub-proceeding by filing a Request for Determination in March 1992. They sought determinations that the Treaty of Neah Bay secured their right to fish for halibut, as well as for other species, in their usual and accustomed fishing grounds, and that those grounds were the same as previously determined for salmon. The United States, the State of Washington, and various other tribes have responded to the Request for Determination. As previously noted, the Makahs then moved for a preliminary injunction.

## HALIBUT FISHING AND REGULATION, GENERALLY

Halibut are highly-prized marine bottomfish. They are non-anadromous fish; i.e., they do not migrate from marine waters into fresh waters. Both commercial and sport fishers harvest halibut, and both treaty and non-treaty fishers. They harvest halibut in huge quantities from the Aleutian Islands and down the coasts of Alaska, Canada, Washington, Oregon and northern California.

Because halibut are taken both by Canadian and United States fishers, the "first level" of regulation is by an international body: the International Pacific Halibut Commission ("IPHC"). A principal purpose of regulation by the IPHC is to assure conservation of the halibut resource.

The IPHC has divided the entire halibut region into distinct areas or zones for halibut fishing (see "Exhibit 1" to this Report and Recommendation). Each year the IPHC sets an allocation of halibut which can be harvested in each area. Halibut is regulated by weight ("biomass"), not by numbers of fish. Thus, in a given year, the IPHC will determine the total weight of halibut which can be taken in each area during the year.

As indicated on exhibit 1, Area 2A comprises all the halibut fishing region south of Canadian waters. This includes the coasts of Washington, Oregon and northern California, as well as the Strait of Juan de Fuca and Puget Sound.

It is worth noting that the halibut allocation in Area 2A is generally quite small compared to that in several other areas. For example, the 1993 allocation to Area 2A was 600,000 pounds. The allocations for areas 2B, 2C and 3A were 10 million, 10 million and 20.7 million pounds, respectively.

The Secretary of Commerce, acting through another agency known as the Pacific Fisheries Management Council ("PFMC"), then divides among domestic

fishers the total allocation for Area 2A. The manner in which the Secretary makes this allocation among competing groups is the focus of one of the two issues in this case.

A principal part of that allocation is to reserve a quantity of the harvest for those tribes which have treaty rights to fish for halibut. The Secretary begins that task by making an administrative determination of which tribes have such treaty rights. He has determined that twelve tribes—including the Makahs—are entitled, under their treaties, to fish for halibut. Next, the Secretary determines the usual and accustomed halibut fishing grounds for each of these tribes. The Secretary has codified these determinations in the Code of Federal Regulations, In the current edition, they appear at 50 C.F.R. § 301.19.

The Secretary and the PFMC have defined a geographic area ("Area 2A–1") which encompasses the usual and accustomed halibut fishing grounds of all twelve tribes. As shown on exhibit 2 to this Report and Recommendation, Area 2A–1 consists of all Washington waters north of the mouth of Grays Harbor, together with the Strait of Juan de Fuca and Puget Sound. It is part, but not all, of Area 2A as defined by the IPHC. The remaining portion runs southward down the Pacific Coast through Oregon and into northern California.

The Secretary and the PFMC then prescribe a quantity of halibut which may be harvested by treaty commercial fishers in Area 2A–1. The Secretary and PFMC allocate the balance to non-treaty commercial fishers and to sport fishers from each group.

The crucial fact, in considering the tribes' contentions in this case, is that the treaty commercial fishers are permitted to harvest halibut only in Area 2A–1. The non-treaty commercial fishers, by con-trast, may harvest halibut anywhere in Area 2A. They may elect to take any or all of their allocation in Area 2A–1, or may take some of it further south, in the remaining portion of Area 2A. In fact, the non-treaty commercial fishers historically have harvested in Area 2A–1 far more halibut than the quantity allocated to the treaty commercial fishers. In 1989 through 1992 inclusive, the non-treaty harvest has consistently been approximately double the treaty harvest.

## TREATY RIGHTS TO FISH FOR HALIBUT IN U.S. WATERS

The first issue presented by all the pending motions is whether the Makahs, and perhaps the other tribes involved in sub-proceeding 92–1, have treaty rights to fish for halibut. The Makahs contend that their treaty preserved their right to fish for halibut, as well as for anadromous fish. The other tribes join in the Makahs' contention and urge that they, too, enjoy treaty rights to fish for halibut. The federal defendants and the State of Oregon concur in the Makahs' position, as a general contention. Only the State of Washington opposes it. And in fact, at least as to the Makahs, Washington's opposition is less than vigorous.

First, the court should determine that this issue has not previously been determined in this case. It is true that, in the original decision in this case, Judge Boldt included some findings that the Makahs, and certain other tribes, customarily fished for halibut prior to the treaty. *U.S. v. Washington*, 384 F.Supp. 312, at 358 and 363 (1974). Despite these findings, Judge Boldt did not determine that any tribes had a treaty right to fish for halibut, or for any non-anadromous fish. Indeed, as later noted by Judge McGovern in his initial ruling on the summary judgment motions, Judge Boldt prescribed a procedure by

which a tribe could apply to the court for determination whether its treaty preserved to it the right to fish for non-anadromous fish. *U.S. v. Washington,* 459 F.Supp. 1020, 1037 (W.D.Wa.1978). If the court had intended in its initial decision to adjudicate the treaty right to fish for halibut, it would not have established a procedure for framing and resolving that very issue in the future.

Next, this court should determine that, on the pending motions, it is appropriate to pass on the treaty rights of only the Makah Tribe. In their motions, the Makahs have clearly requested a determination that they have treaty rights to fish for halibut. They have supported their motion with substantial evidentiary documentation. The State of Washington has had ample opportunity to review those submissions and to present any evidence to the contrary. The issue of the Makahs' treaty rights is properly before the court.

The situation is very different, however, as to the other tribes. Several tribes have "joined" in the Makahs' request for determination and in the Makahs' motions, and have made clear in their briefs and oral arguments that they would welcome a court determination that they, too, have treaty rights to fish for halibut. But no tribe other than the Makahs has filed a request for determination, or has specifically moved for a ruling seeking such relief. Nor has any other tribe made a timely and complete evidentiary showing comparable to that made, by the Makahs. In short, no other tribe has presented the issue to the court in a manner which might warrant the granting of relief on the pending motions.

The court should therefore review the Secretary's determination as to the Makahs' treaty right to fish for halibut and should leave to another day any determination as to similar rights for other tribes.

The next issue relates to the applicable burden of proof. Many of the court's past determinations of treaty fishing rights involved fisheries regulated by the State of Washington. Halibut fishing, by contrast, is regulated by federal authorities. The court's task in passing upon treaty fishing rights is correspondingly different. Here, federal authorities have already made administrative determinations as to which tribes have treaty rights to fish for halibut. This court's role is essentially one of reviewing the determinations of the administrative agency charged with regulation of the subject matter in question.

This distinction is important for several reasons. First, the determinations of the responsible agency are binding upon the parties unless and until there has been a timely application for review to a court with jurisdiction to hear it, and that court has countermanded the agency's determination in some way. Thus, if the court declines (as here recommended) to make a summary adjudication as to the treaty rights of tribes other than the Makahs, the agency determination that other tribes have such treaty rights remains binding, and provides the basis for regulation of the fishery.

Secondly, while this court is not bound by the Secretary's determination that the Makahs have treaty rights to fish for halibut, it must accord that determination great deference. The court may reach a contrary conclusion only if it is shown that the action of the agency was arbitrary, capricious, or otherwise contrary to law.

▮▮▮ Applying that standard to this case, the court should conclude, first, that the record amply supports the Secretary's determination that the Treaty of Neah Bay preserved the Makahs' right to take halibut, as well as anadromous fish. The Makahs have presented evidence which over-

whelmingly establishes that they fished for halibut at treaty times, and that they would have understood the assurances in the treaty to cover halibut, as well as salmon. (See the exhibits A through CC, presented with the Makahs* response to an early motion to dismiss before Judge McGovern; and exhibits DD through DDD, filed May 6, 1991.) Those materials include, for example, a number of reports by Dr. Barbara Lane, upon whom the court has relied extensively over the history of this case. Dr. Lane describes the Makahs' reliance on halibut fishing over many centuries prior to the time the treaties were signed.

The State of Washington has presented little or no evidence to the contrary. There is no basis whatever to conclude that the Secretary's determination of the Makahs' treaty right is arbitrary, capricious, or contrary to law in any respect.

■ The next issue is whether the treaty rights to fish for halibut are the same as the treaty rights to fish for salmon. More specifically, the issue is whether the Makahs are entitled to an opportunity to take 50% of the harvestable surplus of halibut in their usual and accustomed halibut fishing grounds, or whether some lower percentage applies. The State of Washington has presented no persuasive basis for applying a different rule for halibut than for salmon, and the court should rule accordingly.

Nevertheless, it is not possible to set a precise percentage at this time. A treaty tribe is entitled to the opportunity to take approximately 50% of the harvestable surplus of salmon which pass through its usual and accustomed fishing grounds, unless a lesser amount is sufficient to assure them a moderate living. *State of Washington v. Washington State Commercial Passenger Fishing Vessel Assn.*, 443 U.S. 658, 685, 99 S.Ct. 3055, 61 L.Ed.2d 823

(1979). The same rule applies to the treaty right to fish for halibut.

Washington has asserted that the Makahs do not require as much as 50% of the available halibut to assure them a moderate living. Judge McGovern ruled that this is a proper issue for this case, and bifurcated it for discovery and trial following determination of the other issues. Accordingly, on these motions the court cannot make a final ruling as to the percentage to which the Makahs are entitled. The court can and should, however, direct the federal defendants to regulate the fishery based upon a 50% share for all tribes with treaty rights to fish for halibut, unless and until the court determines that a lesser percentage should apply. This is appropriate because Washington bears the burden of sustaining its contention that a lesser amount will assure a tribe a moderate living.

■ The next issue is the definition of the Makahs' usual and accustomed grounds for halibut fishing. The Secretary of Commerce has determined the boundaries of those grounds. 50 C.F.R. § 301.19. Washington challenges that finding, asserting there is no evidence that the Makahs fished for halibut throughout the area described by the Secretary's regulation. The Makahs have submitted evidence that they fished for halibut wherever they were available within the Makahs' usual and accustomed salmon fishing grounds. Again, the court should find that the record adequately supports the determination of the Secretary, and that Washington presents no basis for the court to substitute its findings on the issue.

### HAVE FEDERAL ALLOCATIONS VIOLATED THE MAKAHS' TREATY RIGHTS?

■ Resolution of these issues brings the court to the first of the two major

areas of dispute between the Makahs and the federal defendants. The Makahs assert that the manner in which the Secretary of Commerce and the PFMC allocate among domestic fishers the available harvest in Area 2A violates the Makahs' treaty rights. For the reasons discussed below, the court should rule that the Makahs are correct in this respect. But because the "moderate living" issue remains for determination, the court can award only limited relief at this time.

As described earlier, the Secretary through the PFMC has allocated each year a portion of the Total Available Catch in Area 2A (historically never more than 25%) to the Makahs and to the other tribes found to have treaty rights to fish for halibut. The bulk of the remainder is allocated to non-treaty commercial fishers. Treaty commercial fishers may harvest halibut only in the portion of Area 2A designated as Area 2A-1. Non-treaty commercial fishers may harvest halibut anywhere they choose within Area 2A.

This system of regulation produces the potential that non-treaty commercial fishers can take far more halibut from Area 2A-1 than the tribes, which have treaty rights to fish there. And in fact that, potential has consistently been the reality. In 1989 through 1992 inclusive, non-treaty commercial fishers have taken from Area 2A-1 a quantity of halibut which was approximately double the Secretary's allocation to treaty commercial fishers.

This regulatory scheme therefore violates the treaty rights of the Makahs to fish for halibut.

In defense of this regulatory procedure, the Secretary relies upon a technical report prepared in 1991 for the IPHC, "Scientific Report No. 74." A copy of this report appears as exhibit 3 to the Federal Defendants' Response to Plaintiff's Motion for Partial Summary Judgment (docket # 216). The importance of this report, according to the federal defendants, is that it provides technical, biological evidence that 40% of the exploitable biomass of Pacific halibut in Area 2A is found within Area 2A-1. Even assuming the Makahs are entitled to a 50% share of the halibut available for harvest at their usual and accustomed fishing grounds, the argument goes, they would only be entitled to an opportunity to harvest 20% of the Total Available Catch in Area 2A.

The court should find this argument totally unpersuasive. Although the Secretary relies upon Scientific Report No. 74 as a basis for justifying his regulatory scheme in retrospect, it is apparent that he has not relied upon it at all in determining any of the allocations. Indeed, the report proves too much. If we were to accept the Secretary's argument, the treaty tribes would be entitled to only 20% of the halibut available in Area 2A. Yet the Secretary has allocated 25% in each of the past several years, including all years since Report No. 74 was prepared. Apparently even the Secretary was not persuaded. More significantly, the report has not had any effect upon the Secretary's regulation of the non-treaty commercial fishers. Over recent years, approximately 70% of the harvest from Area 2A has been taken in Area 2A-1, with only small variations from year to year. Nothing in the Secretary's allocations has forbidden this distribution of the harvest. This demonstrates that the Secretary did not rely upon Report No. 74 for any purpose.

Nor can the Secretary rely upon conservation of the halibut resource as a basis for the limit he has placed upon the allocation to treaty fishers. The evidence affirmatively shows that there has been no adverse effect on the resource, despite the fact that approximately 70% of the Area

2A harvest has been taken in Area 2A–1 each year for several years.

In summary, therefore, the court should find that the Secretary's past procedure for regulating the harvest of halibut violated the Makahs' treaty rights, because the regulations placed limits on the treaty harvest in the Makahs' usual and accustomed fishing grounds without placing similar limits on the non-treaty harvest in the same area.

The next issue is whether the Makahs are entitled to relief for the effects of the Secretary's regulatory scheme in the years 1985 through 1992. Different considerations apply to different years.

In the years 1985 and 1986, the actual harvest of halibut by the Makahs fell far short of the quantities allocated to them by the Secretary. The court should therefore rule that the Makahs are entitled to no relief for those years. The Makahs contend that the "low" allocations discouraged them from developing their halibut fleet. But it is not clear how the level of the allocation could have inhibited the growth of the fleet in years where the allocation was far above the capacity to catch fish. The court should grant the motion of the federal defendants for partial summary judgment as to the request for relief as to the 1985 and 1986 regulations.

The Makahs do not request relief for the 1987 and 1988 regulations.

In 1989 through 1992, the Makahs harvested essentially their entire allocation. Until the court resolves the issue of "a moderate living," however, it cannot determine whether the Makahs are entitled to any relief for those years. If the court finds that the Makahs are entitled to a full 50% share, they might well be entitled to relief for the denial of the opportunity to take that share during 1989 through 1992. But if the court sets a lower percentage, it

is possible that the Makahs' allocation during those years was adequate. Accordingly, the court should deny without prejudice all parties' motions for summary judgment as to 1989 through 1992.

The claims as to the fishing season of 1993 present special problems. The Makahs' motions for a preliminary injunction sought prospective relief, directed toward the regulatory scheme to be applied to the 1993 season. But various delays, including the delays which have already occurred and will yet occur in resolution of the motions, have probably rendered the issue as to the 1993 season essentially moot. I recommend the court treat the 1993 season in the same manner as the 1989 through 1992 seasons.

**PROSPECTIVE RELIEF**

The remaining issue is whether the court should award prospective relief as to the manner in which the Secretary regulates halibut fishing in U.S. waters in 1994 and future years.

As discussed above, the Makahs' motion for preliminary injunction sought relief as to the 1993 season. By the time the court makes a final ruling on these five motions, it will be too late to afford any effective relief as to that season.

In fairness to the parties, however, the court should address directly the issue of whether prospective relief is appropriate as to the manner of regulating the halibut fishery in 1994 and subsequent years. In other words, although the motion for injunctive relief was addressed to the 1993 season, the court should rule on it as if it were addressed to the 1994 season and subsequent years.

For the reasons discussed above, the Secretary's established system of regulating the halibut fishery does not protect the rights of the treaty tribes to harvest their

fair share of halibut. The Secretary has employed the same regulatory scheme for a number of years, and it is reasonable to assume that he will do so again in 1994 in the absence of action by the court.

This court has previously ruled, in other contexts, that the denial of treaty-protected fishing rights is an irreparable injury; that it cannot be properly compensated by an award of damages after the fact; and that it is the proper subject of preliminary injunctive relief.

The court should direct the Secretary to modify his regulatory scheme for 1994 and subsequent years. The Makahs urge the court to direct the Secretary to allocate to the treaty commercial fishers 35% of the harvestable halibut in Area 2A. Their rationale is that, historically, 70% of the Area 2A harvest has been taken in Area 2A–1, and the treaty fishers are entitled to half. The Secretary, while agreeing that the tribes are entitled to half, argues that what is to be divided is the available halibut biomass in Area 2A, and that the best available information, Scientific Report No. 74, sets that figure at 40% of the total Area 2A allocation.

The court should decline the Makahs' invitation to substitute its conclusion for that of the Secretary as to the halibut biomass available in Area 2A-1. The court should, instead, follow the suggestion at oral argument by counsel for the federal defendants, and afford the Secretary the opportunity to fashion a new regulatory scheme, in accordance with general parameters provided by the court. The first of these parameters is that the regulatory scheme should protect rights of the Makahs and of such other tribes which the Secretary has determined or will determine are entitled by treaty to fish for halibut. The Secretary's list of tribes with treaty rights is subject to modification based upon later determinations by the court. Secondly, the Secretary should base his regulation upon the usual and accustomed halibut fishing grounds, as determined by the Secretary, unless and until the court modifies those determinations. Third, the allocations must afford treaty commercial fishers and non-treaty commercial fishers the opportunity to take equal quantities of halibut within the usual and accustomed fishing grounds of these tribes. This equal sharing principle is subject to adjustment if the court determines a lesser quantity is sufficient to assure a tribe a moderate living.

This obviously poses a very complex regulatory problem. There are twelve tribes involved, each with different usual and accustomed fishing grounds. The Secretary's approach to this problem has been to define a single area which encompasses all of those fishing grounds, and then to make an overall allocation to the tribal fishers. While lacking mathematical precision, this is a reasonable approach to a complex problem. The evil in the Secretary's past procedure, however, is that he did not limit the harvest of the non-treaty commercial fishers in Area 2A–1 in the same manner as he limited the harvest of the treaty commercial fishers. The lack of such limits has permitted the non-treaty commercial fishers to harvest, from the tribes' usual and accustomed fishing grounds, double the quantity of halibut allocated to the tribes.

The Jamestown S'Klallam, Lower Elwha S'Klallam, Port Gamble S'Klallam and Skokomish Tribes request that any injunctive relief prescribe that a fixed percentage of the tribal allocation in Area 2A–1 can only be taken in the Puget Sound fishery, including the Strait of Juan de Fuca. Because only some of the tribes with halibut fishing rights can fish in those areas, this requested relief would, in effect, be an inter-tribal allocation of the treaty

share. All other parties, including the other tribes which have addressed the issue, oppose this request.

The court should decline to make such an inter-tribal allocation in this case. The division of the total treaty harvest among the tribes entitled to share in it has been the subject of extended negotiation by the tribes and consideration by the court in other, pending sub-proceedings. The court should not pre-empt the resolution of those issues by a piece-meal ruling on these motions.

## SWIFTSURE AND 40 MILE BANKS

■ Swiftsure and 40 Mile Banks are two highly productive fishing grounds for halibut. Swiftsure Bank lies between the United States and Canada in the Strait of Juan de Fuca. 40 Mile Bank is west of the Strait. Prior to the signing of the Treaty of Neah Bay, the Makahs fished for halibut at both locations, as this court previously found. *U.S. v. Washington,* 384 F.Supp. 312, 364 (W.D.Wn.1974); and *id.,* 626 F.Supp. 1405, 1467 (W.D.Wn.1985). The Makahs introduced evidence suggesting that the continued opportunity to fish for halibut in these two areas was important to the Makahs at the time the treaty was signed.

At that time, however, and for over a century thereafter, these two fishing grounds were not within the jurisdiction of any nation. The United States and Canada each asserted jurisdiction only within three miles of their respective coasts. These fishing grounds were more than three miles from either country and were therefore on the high seas. The Makahs had the same right to fish there as any fishers of any nationality. The United States had no authority to control who did and did not have access to these two fishing grounds.

In 1976, first Canada and then the United States declared a "fishery conservation zone" ("FCZ") extending 200 miles from their coasts. In the Strait of Juan de Fuca, which was far narrower than 400 miles, the countries agreed that a line equidistant between the countries would define the respective FCZ of each. This line placed all of 40 Mile Bank, and all but a small part of Swiftsure Bank, within Canada's FCZ.

Each country prohibited from its FCZ commercial fishers from the other country (the designation of the zone was later changed to "Exclusive Economic Zones," or "EEZ"). In a Protocol signed by the United States and Canada in 1979, Canada agreed that sport fishers from the United States could fish for halibut at these two grounds, but the prohibition against commercial fishers continued. In these respects, there was no discrimination for or against treaty fishers.

The Makahs assert that the federal defendants were required to protect the Makahs' opportunity to fish in these two areas. This obligation arises, they argue, by virtue of the Treaty of Neah Bay, and also by reason of the trust responsibility of the United States to the treaty tribes. The federal defendants failed to make any effort to protect that fishing opportunity, the Makahs contend. Therefore, they ask the court to order the federal defendants:

(1) to attempt to secure, by negotiation or otherwise, an opportunity for treaty commercial fishers to resume fishing in these two areas;

(2) if that effort is unsuccessful, to "mitigate" the Makahs' loss by providing some other remedy. The Makahs do not ask the court to specify the precise remedy at this time, but suggest that the court direct the federal defendants to negotiate with all parties and then propose a remedy. The

Makahs do indicate possible examples of such relief, e.g., awarding the Makahs a share of more than 50% in areas where they are permitted to fish, or permitting them to fish at "in lieu" sites, outside of their usual and accustomed fishing grounds.

The federal defendants respond that, as a matter of law, the Secretary of State does not have the duty or obligation alleged by the Makahs. They contend that the treaty rights of the Makahs cannot affect the authority of the Secretary of State to negotiate with Canada as to the respective EEZs of the two countries. They also contend that the U.S. Court of Appeals for the Ninth Circuit has ruled that the usual and accustomed fishing grounds of a tribe can exist only in waters within the jurisdiction of the United States. *U.S. v. Washington,* 730 F.2d 1314, 1316 (9th Cir.1984). Further, they contend that in any event federal officials did attempt to protect the Makahs' opportunity to fish at these two sites. Finally, they contend that, even if the federal defendants breached some duty to the Makahs, there is no authority to support the extraordinary forms of injunctive relief sought by the Makahs.

The State of Washington basically concurs with the position of the federal defendants on this issue. The State of Oregon contends that the remedies sought by the Makahs are inappropriate for a variety of reasons. One of those reasons is that the remedies would have drastic and unfair effects on innocent third parties; e.g., if the Makahs were awarded "in lieu" fishing sites in Oregon, existing fishers in that state would be unfairly penalized for the failures of federal officials.

All three parties move for partial summary judgment on this issue.

The court should sustain the contention of the federal defendants that, as a matter of law, they were not obliged to attempt to secure fishing rights for the Makahs in waters which were never subject to the jurisdiction of the United States.

First, as contended by the federal defendants, the Ninth Circuit did note with approval a ruling by the district court that the "usual and accustomed fishing grounds" of a tribe were limited to areas within the FCZ. *U.S. v. Washington,* 730 F.2d 1314, 1316 (9th Cir.1984). Therefore, Swiftsure and 40 Mile Banks were never within the Makahs' "usual and accustomed fishing grounds" for purposes of treaty protections, despite the fact that Makah fishers in fact fished for halibut at those locations.

Furthermore, none of the authorities cited by the Makahs impose an obligation on the United states, in the conduct of foreign affairs, to secure the opportunity for a treaty tribe to fish or hunt in territory outside the jurisdiction of the United States.

The court should therefore grant the federal defendants' motion for partial summary judgment on this issue.

In light of this ruling, the court should not reach the issue of what form of relief is appropriate for the breach of any duty by the federal defendants.

## PROPOSED ORDER

Accompanying this Report and Recommendation is a proposed order which sets forth the rulings here recommended.

Exhibit 1
to Report and Recommendation

Figure 1 to Part 301

Int'l. Regulatory Agencies (Fishing and Whaling) Pt. 301, Fig. 1

Vancouver Island

CANADA
UNITED STATES

Into Puget Sound → 48°

Washington

Subarea 2A-1

125° 44'00"W.

47°

46° 53'18"N.

126° 125° 124°

Exhibit 2
to Report and Recommendation